40 March 26, 2015 No. 11

IN THE SUPREME COURT OF THE
STATE OF OREGON

POWEREX CORPORATION,
*Plaintiff-Respondent,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant-Appellant.*

(TC 4800; SC S060859)

En Banc

On appeal from the Oregon Tax Court.*

Henry C. Breithaupt, Judge.

Argued and submitted May 1, 2014.

Marilyn Harbur, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellant. With her on the briefs was Ellen F. Rosenblum, Attorney General.

Eric J. Coffill, Morrison & Foerster LLP, Sacramento, California, argued the cause and filed the brief for respondent. With him on the brief were Jenny Choi and Carol Vogt Lavine, Gladstone, Oregon.

Scott G. Seidman, Tonkon Torp LLP, Portland, filed the briefs for *amicus curiae* Portland General Electric Company. With him on the briefs was Michael J. Millender.

KISTLER, J.

The judgment of the Tax Court is affirmed in part and reversed in part. The case is remanded for proceedings consistent with this opinion.

_____
* 20 OTR 338 (2011).

**KISTLER, J.**

Powerex wholesales natural gas and electricity to purchasers throughout the western part of North America. The question in this case is how much of Powerex's income may Oregon tax. Under the terms of a uniform statute that Oregon has adopted, the answer to that question turns on the extent to which Powerex's sales of natural gas and electricity were "in this state." ORS 314.665(1). For the reasons explained below, we agree with the Tax Court that none of Powerex's natural gas sales occurred in Oregon. However, we do not necessarily agree with the Tax Court that none of Powerex's electricity sales occurred in Oregon. The Tax Court did not reach an issue—whether the electricity that Powerex sold was "delivered or shipped to a purchaser *** within this state"—that, as we explain below, controls whether Powerex's electricity sales were "in this state." *See* ORS 314.665(2)(a) (stating that standard). We accordingly affirm the Tax Court's judgment in part, reverse it in part, and remand the case for further proceedings.

Before setting out the facts in this case, we first describe briefly the statutory framework in which this case arises. In 1965, Oregon adopted the Uniform Division of Income for Tax Purposes Act (UDITPA), codified at ORS 314.605 to 314.675, to apportion income earned by unitary businesses that operate within and without Oregon. *See* Or Laws 1965, ch 152; *Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 302, 297 P3d 1256 (2013).[1] Generally, UDITPA uses the percentage of a multistate company's sales within Oregon (the "sales factor") to determine the percentage of the company's business income that Oregon may tax. *See* ORS 314.650. Specifically, for each tax year, a company's sales "in this state" are divided by the company's total sales to arrive at the sales factor. ORS 314.665(1). Currently, the company's total income is multiplied by the sales factor to

---

[1] ORS 314.280 governs the apportionment of income earned by public utilities and financial institutions. UDITPA governs the apportionment of income earned by other types of businesses. *See Crystal Communications, Inc.*, 353 Or at 302. Throughout this litigation, the Oregon Department of Revenue has taken the position that UDITPA governs the apportionment of Powerex's income. We accept that assumption for the purposes of deciding the department's claims on appeal. We express no opinion on whether ORS 314.280, if applicable, would lead to a different result.

determine the percentage of the company's income that is subject to taxation in Oregon. ORS 314.650.[2]

This case turns on whether Powerex's sales of electricity and natural gas occurred "in this state." The rules for making that determination differ depending on whether the sales are sales of "tangible personal property" or other types of sales. ORS 314.665(2), (4).[3] Generally, sales of tangible personal property are "in this state" if "[t]he property is delivered or shipped to a purchaser * * * within this state regardless of the f.o.b. point or other conditions of the sale." ORS 314.665(2)(a). Generally, sales of something other than tangible personal property are "in this state" if the greater part of the activity that produced the income from those sales occurred within Oregon. ORS 314.665(4).

In the Tax Court, the parties agreed that natural gas is tangible personal property. They disagreed whether, in selling natural gas, Powerex shipped or delivered natural gas to purchasers "within this state." The Tax Court found that Powerex shipped gas to purchasers in other states through a hub in Malin, Oregon, where two pipelines intersect. It concluded that, in doing so, Powerex had not shipped or delivered gas to purchasers within Oregon.

Regarding Powerex's sales of electricity, the parties disagreed whether electricity is tangible personal property. The Tax Court ruled that electricity is not tangible personal property and that, because the greater part of the activity that produced the income from Powerex's electricity sales occurred in British Columbia, those sales were not attributable to Oregon. The Tax Court accordingly concluded that,

---

[2] Oregon law currently provides that only the sales factor is used to determine the percentage of a multistate company's income that is taxable in Oregon. ORS 314.650. For the tax years at issue here, a company's income was multiplied by a weighted average of three factors (the sales factor, the property factor, and the payroll factor) to determine the percentage of its income that was taxable in Oregon. *See, e.g.*, ORS 314.650 (2001); ORS 314.650 (1999). However, only the sales factor is at issue on this appeal, and we discuss only that factor.

[3] UDITPA divides sales into two categories: "sales of tangible personal property" and "[s]ales, other than sales of tangible personal property." ORS 314.665(2), (4). The latter category is not limited to sales of intangible property but also includes other types of sales, such as the sale of services. *See* Jerome R. Hellerstein, Walter Hellerstein, and John A. Swain, *1 State Taxation* ¶ 8.06[3][b] (3d ed 2000 & Supp 2014) (discussing allocation of sales other than sales of tangible personal property).

for the tax years at issue here, neither Powerex's sales of electricity nor its sales of natural gas were "in this state."

On appeal, the Oregon Department of Revenue (the department) challenges both of the Tax Court's rulings. We begin with the Tax Court's ruling that the natural gas that Powerex sold was not shipped or delivered to purchasers "within this state." We then turn to its ruling that electricity is not tangible personal property.

## I.  NATURAL GAS

Natural gas is transmitted through interstate and intrastate pipelines organized around regional "market centers" or "hubs."[4] The concept of a market center or hub (for our purposes, the terms are synonymous) emerged as a result of a 1992 Federal Energy Regulatory Commission order, which required that "interstate natural gas pipeline companies transform themselves from buyers and sellers of natural gas to [become] strictly gas transporters." "Market centers and hubs evolved to provide new gas shippers with many of the physical capabilities and administrative support services formally handled by the interstate pipeline company as 'bundled' sales services." Among other things, market centers and hubs provide "transportation between and interconnections with other pipelines, and the physical coverage of short-term receipt/delivery balancing needs."[5]

In 2003, there were 37 market centers or hubs in the United States and Canada. Two of those hubs, Stanfield and Malin, were in Oregon. In 2003, Powerex sold natural gas to retailers in California through the hub in Malin. When Powerex filed its Oregon tax returns for the 2003 tax year, it treated those sales as sales "in this state" for the purpose of calculating the "sales factor"—*i.e.*, for the purpose of calculating the percentage of Powerex's total income that was attributable to Oregon. In 2006, Powerex filed a claim for a refund for the 2003 tax year. In its filing, Powerex explained

---

[4] The following facts regarding the shipment of natural gas are taken from a stipulated exhibit. Neither side offered any testimony on that subject.

[5] Depending on the market center or hub's infrastructure, market centers or hubs can balance the supply of and demand for natural gas by, among other things, parking or loaning natural gas on a short-term basis, storing it on a longer term basis, and entering into other "short-term interruptible arrangement[s]."

that it had shipped the natural gas to the hub at Malin, Oregon "where title transferred to the purchaser." Its refund claim stated that the gas then "entered into PG&E's system for transport into California."[6]

Before the Tax Court, the department argued that, because the contractual point of delivery was in Malin, Oregon, Powerex "delivered or shipped [the natural gas] to a purchaser * * * within this state." Powerex responded that the department's focus on the contractual point of delivery missed the mark. In Powerex's view, Malin merely served as the point at which gas was transferred from one pipeline to another on its way to a purchaser in California. Powerex argued that, because it shipped the gas to a purchaser in California, it did not deliver or ship it to a purchaser within Oregon.

The Tax Court agreed with Powerex. It found that the gas was being transmitted over pipelines that functioned as common carriers. It explained that both the majority of cases interpreting other states' analogues to ORS 314.665(2) and the purpose of that rule supported the conclusion that "where delivery by a seller is to a common carrier for further shipment an ultimate destination approach is followed." Because the ultimate destination in this case was California, the Tax Court concluded that Powerex's natural gas sales were not sales "to a purchaser * * * within this state." *See* ORS 314.665(2)(a).

On appeal, the department does not dispute that the natural gas that Powerex sold was destined for California. It also does not question the Tax Court's implicit finding that two pipelines connected at the "hub" in Malin so that the natural gas that Powerex delivered through one pipeline to Malin flowed from that pipeline into another pipeline on its way to the purchaser in California. The department argues, however, that the hub at Malin was critical for two reasons: (1) the natural gas contracts that Powerex entered into specified Malin as the "contractual point of delivery" and (2) they

---

[6] The Tax Court found that the gas that Powerex sold was shipped or delivered to purchasers outside of Oregon. Powerex stated that the natural gas was shipped or delivered to purchasers in California, and we assume that California was the gas's ultimate destination.

also specified that title to the gas passed from Powerex to the purchaser at Malin. The department reasons that, given those two facts, we should conclude that the natural gas was "delivered or shipped to [the] purchaser" in Malin, Oregon, not in California.

In considering the department's argument, we look initially to the text, context, and history of ORS 314.665(2). *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We begin with the text of that statute, which provides, in part:

> "Sales of tangible personal property are in this state if:
>
> "(a)    The property is delivered or shipped to a purchaser, other than the United States, within this state regardless of the f.o.b. point or other conditions of the sale[.]"

ORS 314.665(2)(a).[7] The text of subsection (2)(a) divides into two parts. The first part provides that a sale of tangible personal property is "in this state if [t]he property is delivered or shipped to a purchaser *** within this state." The second part provides that the determination where property is shipped or delivered to the purchaser should be made without regard to "the f.o.b. point or other conditions of the sale."

Textually, the first part of the statute asks a simple question: Where was the property shipped or delivered to the purchaser? *See* Arthur D. Lynn, Jr., *The Uniform Division of Income for Tax Purposes Act*, 19 Ohio St LJ 41, 50 (1958) (noting the "conceptual simplicity" of the Uniform Act formulation).[8] In asking that question, ORS 314.665(2)(a) uses the passive voice. The question under that statute is not who shipped or delivered the property to the purchaser but where the property was shipped or delivered to the purchaser.

---

[7] The subsection quoted above states the general rule. ORS 314.665(2) (b) states two exceptions to that rule. ORS 314.665(2)(b) addresses sales to the United States and sales to purchasers in states where the taxpayer is exempt from taxation. It provides that sales are within this state if the goods are shipped from an office, warehouse, or other place of storage in this state and either the purchaser is the United States Government or the taxpayer is not taxable in the state where the goods are shipped or delivered to the purchaser.

[8] We refer to the Oregon statute as UDITPA. We refer to the uniform act on which Oregon based UDITPA as the Uniform Act. ORS 314.665(2)(a) tracks essentially verbatim the corresponding section of the Uniform Act.

The second part of the statute reinforces that conclusion. It provides that the determination of where property is shipped or delivered to the purchaser should be made "regardless of the f.o.b. point or other conditions of the sale." We assume that the rule of *ejusdem generis* applies so that the phrase "other conditions of the sale" shares the same qualities as the specific term that precedes it, "the f.o.b. point." *See Baker v. City of Lakeside*, 343 Or 70, 76, 164 P3d 259 (2007). That is, the phrase "other conditions of the sale" refers to those conditions of the sale that are similar to "the f.o.b. point." *See id.* The primary conclusion that we draw, at this point, from the second part of the text is that it reinforces what the first part says. The question where tangible property was delivered or shipped to the purchaser should not turn on legal technicalities, such as the f.o.b. point; rather, the question calls for a more practical answer.

In addition to the text of ORS 314.665(2)(a), we also consider its context. *See Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) (explaining that the context for interpreting a statute's text includes the preexisting common law and the statutory framework within which the law was enacted). ORS 314.665 is modeled on a uniform law that the Commissioners on Uniform State Laws proposed in 1957 and that Oregon adopted in 1965. *Compare* Or Laws 1965, ch 152, § 17, *with* Uniform Act, § 16 (1957). In 1957 and also in 1965, the meaning of the phrase "the f.o.b. point" was well-established. *See* Samuel Williston, 2 *The Law Governing the Sale of Goods* §§ 280-280b (rev ed 1948); Laurence Vold, *The Handbook of the Law of Sales* § 33 (2d ed 1959).

The initials f.o.b. stand for the words "free on board" and were originally used in connection with the shipment of goods by sea. Williston, 2 *The Law of Sales* § 280. "[T]he primary significance of the words was that the seller [wa]s bound to put the goods free of expense on board a vessel for transportation to the buyer." *Id.* The same rule also applied when goods were shipped by rail or other forms of transportation, although questions could arise regarding the extent of the seller's obligation. *See id.* Williston explained that, to avoid those questions, the parties could specify more precisely the point to which the seller was bound to deliver the goods. For

example, "[w]here the contract is for a sale f.o.b., the place of destination, undoubtedly the seller contracts to get the goods to that place, and this involves getting cars in which to load the goods when transportation is to be by rail ***." *Id.* § 280a. Williston explained that two presumptions attach to the f.o.b. point. *Id.* § 280b. First, title to the goods passes at the f.o.b. point. *Id.* Second, "the place where the goods are to be delivered f.o.b. is the place of delivery to the buyer." *Id.*

That established definition of "the f.o.b. point" informs the meaning of the first part of the statute, as an example will illustrate. Suppose that a seller agrees to ship goods by rail from Vancouver, Washington, to a purchaser in Los Angeles, California. Those goods could be shipped f.o.b. Vancouver, f.o.b. Portland, or even f.o.b. Los Angeles. *See id.* at § 280a (explaining that even "though the expressions f.o.b. the point of destination or some intermediate point are less common [than f.o.b. the point of shipment], such bargains are not infrequent"). Whichever f.o.b. point the agreement specified would establish, as a condition of the sale, the place where the seller was responsible for delivering the goods, the place where title passed to the buyer, and the place of delivery to the buyer. *See id.* at §§ 280a, 280b. However, the text of ORS 314.665(2)(a), read in context, makes clear that, for the purposes of determining the "sales factor," the place where property is shipped or delivered to the purchaser is determined without regard to "the f.o.b. point or other conditions of the sale." In the example set out above, the place where the goods were shipped to the purchaser would be Los Angeles. That is true even if the goods were shipped f.o.b. Portland and even if, as a result, title passed to the buyer in Portland and the contractual place of delivery was Portland.

The history of the rule leads to the same conclusion. Before the Commissioners on Uniform State Laws adopted the Uniform Act in 1957, sales of tangible property by multistate businesses were allocated among states based on the property's (1) destination; (2) origin; (3) the location of the sales office; (4) sales activity; or (5) place of acceptance by the purchaser. *State Taxation of Interstate Commerce: Report of the Special Subcommittee on State Taxation of Interstate*

*Commerce*, House Committee on the Judiciary, H R Rep No 952, 89th Cong, 1st Sess, 181-83 (1965); *see* Jerome R. Hellerstein, Walter Hellerstein, and John A. Swain, 1 *State Taxation* ¶ 9.18(1) (3d ed 2000 & Supp 2014).

Each of those theories for allocating sales of tangible personal property had its disadvantages. However, one theory—allocating sales to the state or country where title passed—was probably the least favored:

> "Apportionment of sales to the state or country where title passes is hit or miss. The effect of the apportionment will depend wholly upon legal conclusions based upon construction of contracts, terms of waybills, customs in the business, evidence as to the intention of the parties, and other considerations having little or no relation to the problem of determining where income is earned."

George T. Altman and Frank M. Keesling, *Allocation of Income in State Taxation* 127 (2d ed 1950). *See also* Frank M. Keesling and John S. Warren, *California's Uniform Division of Income for Tax Purposes Act Part I*, 15 UCLA L Rev 156, 161 (1967) ("Most states consider the place where title passes irrelevant in determining the source of income.").

The comment to section 16 of the Uniform Act, on which Oregon modeled ORS 314.665, suggests, as do the text and context of that section, that the drafters of the Uniform Act did not intend to allocate sales based on where title passed; rather, they intended to adopt the ultimate-destination theory of allocating sales. We note that the comment does not explain how the general rule—that sales are allocated to the place where tangible personal property is shipped or delivered to the purchaser—works. Instead, the comment identifies two variations on that general rule and explains how the Uniform Act would allocate sales in those situations. The comment also discusses an exception to the general rule and the reason for the exception. In doing so, the comment sheds light, albeit indirectly, on the meaning of the general rule.

Regarding the first variation, the comment states: "The phrase 'delivered or shipped to a purchaser' in this state includes shipments, at the designation of the purchaser, to a

person in this state such as designating, while a shipment is en route, the ultimate recipient." Uniform Act, § 16, comment. Although its syntax leaves something to be desired, that part of the comment recognizes that tangible personal property will be shipped or delivered to a purchaser within this state when the purchaser designates a person in this state as the "ultimate recipient" of the property. The comment thus clarifies that, in determining the place where tangible personal property is shipped or delivered to the purchaser, the identity of the "ultimate recipient" can matter.

The comment also discusses why the Uniform Act excepts shipments to the United States government from the general rule. It explains:

> "Sales to the United States are treated separately. It is thought that this is justified because sales to the United States are not necessarily attributable to a market existing in the state to which the goods are originally shipped. This different treatment may also be justified because, if the goods are defense or war materials, it may be impossible to determine whether the goods ever came to rest in the state due to use of coded delivery instructions."

Uniform Act, § 16, comment. As the comment notes, one reason for excepting goods sold to the United States from the general rule is that, for some categories of goods, "it may be impossible to determine whether the goods [sold to the United States] ever came to rest in the state" to which they were delivered or shipped. Implicit in that explanation is that ordinarily what matters in determining where property was shipped or delivered to the purchaser is where the property "came to rest."[9]

---

[9] The other reason the comment notes for excepting sales to the United States points in the same direction. By providing that sales are allocated to the state where the goods are shipped or delivered to the purchaser, the Uniform Act recognizes the contribution that "the state of destination, which provides the market, [makes] to the generation of income." Lynn, *The Uniform Division of Income for Tax Purposes Act*, 19 Ohio St LJ at 51; *see also* Keesling and Warren, *California's Uniform Division of Income for Tax Purposes Act Part I*, 15 UCLA L Rev at 161 (same). As the comment explains, however, sales of goods to the United States "are not necessarily attributable to the market existing in the state to which the goods are originally shipped." Uniform Act, § 16, comment. As a consequence, sales to the United States are not attributed to the state where the goods are shipped or delivered but instead are allocated to the state from which the goods are shipped. *See* ORS 314.665(2)(b) (so providing).

Given the text, context, and history of the Uniform Act, most legal authorities have acknowledged that section 16(a) of the Uniform Act is best read as embodying an ultimate-destination theory of sales apportionment. Professors Keesling and Warren understood the Uniform Act to adopt the destination theory. "The Act provides that sales of tangible personal property should be apportioned to the state or country of destination, provided the taxpayer is subject to tax in such state or country." Frank M. Keesling and John S. Warren, *California's Uniform Division of Income for Tax Purposes Act Part II*, 15 UCLA L Rev 655, 671 (1968); *see also* Lynn, *The Uniform Division of Income for Tax Purposes Act*, 19 Ohio St LJ at 50 (describing Section 16(a) of [the Uniform Act] as "assign[ing] sales to the sales factor numerator of the state of delivery," that is, "*customer location*") (emphasis added). So, too, has almost every jurisdiction that has interpreted the text. *See, e.g., Olympia Brewing Co. v. Comm'r of Revenue*, 326 NW2d 642, 648 (Minn 1982); *McDonnell Douglas Corp. v. Franchise Tax Bd.*, 26 Cal App 4th 1789, 1794, 33 Cal Rptr 2d 129 (1994) (collecting cases); Hellerstein *et al.*, 1 *State Taxation* § 9.18[1][a] ("[M]ost courts that have considered the issue have adopted the ultimate-destination rule rather than the place-of-delivery rule.").

We recognize that asking where property was shipped or delivered to the purchaser does not always lead to a clear answer. One issue has arisen when a seller ships goods to a loading dock in one state where the purchaser picks them up and then transports them to their "ultimate destination" in another state. *See Department of Revenue v. Parker Banana*, 391 So 2d 762 (Fla Dist Ct App 1980); Hellerstein *et al.*, 1 *State Taxation* ¶ 9.18[1][a] (discussing issue). The question in that situation is whether the goods were shipped to the purchaser in the first state or the second. In analyzing that question, the seminal case started from the proposition that, if the seller had shipped the goods to the loading dock in the first state and a common carrier had picked the goods up and delivered them to the purchaser in the second state, then the goods would have been "delivered or shipped to [the] purchaser" in the second state for the

purposes of UDITPA. *See Parker Banana*, 391 So 2d at 763. The court held that the result should be no different if the purchaser picked up the goods at the loading dock in the first state and transported them itself to their ultimate destination in the second state rather than having a common carrier do so. *See id.* at 764. Agreement is not universal, however. *See* Hellerstein *et al.*, 1 *State Taxation* ¶ 9.18[1][a] (recognizing general agreement with *Parker Banana* but noting that asking where the goods were shipped rather than ultimately received would be a more administratively convenient test).

Although the parties urge us to take a position on that issue, the Tax Court's opinion obviates the need to do so. As we read the Tax Court's opinion, it found that Malin was simply the point at which the natural gas that Powerex sold went from one pipeline to another pipeline on its way to its ultimate destination outside of Oregon. More importantly, the Tax Court analogized the role that the pipelines played to that of common carriers. It explained that "it appears that the gas in question is being transmitted over interstate pipelines that are, or function as, common carriers." Given the Tax Court's findings, we conclude that this case does not require us to decide what the rule should be when the purchaser takes physical possession of the goods at a loading dock in one state and transports them itself to their ultimate destination in another state. Rather, this is a case in which the natural gas merely went from one "common carrier" to another at Malin on the gas's way to the purchaser in California. The department identifies no case in which any court has held that such a transfer constitutes a "delivery" to the purchaser within the meaning of UDITPA or its analogues in other states.

The department argues, however, that we should reach a different conclusion for three reasons. First, as noted above, the department argues that "the contractual points of delivery for Powerex's natural gas transactions were in Oregon." It also notes that "title to the [natural gas] passe[d] from Powerex to its purchasers at the delivery point specified in their contracts"—namely, in Malin. The department concludes from those facts that Powerex delivered the natural gas to the purchasers in Malin, not in California.

The department never explains what the phrase "contractual point of delivery" means.[10] The record, however, contains two standard form contracts that Powerex incorporated by reference in selling natural gas.[11] One form sets out the general terms and conditions for "Base Contracts for Sale and Purchase of Natural Gas." The other sets out general terms and conditions for a "Base Contract for Short-Term Sale and Purchase of Natural Gas."[12] Section One of the Base Contract for Sale and Purchase of Natural Gas defines "Delivery Point(s)" as "mean[ing] such point(s) as are agreed to by the parties in a transaction." Section Four provides that "[s]eller shall have the sole responsibility for transporting the Gas to the Delivery Point(s). Buyer shall have the sole responsibility for transporting the Gas from the Delivery Point(s)." Section Eight of the agreement provides:

> "Unless otherwise specified, title to the Gas shall pass from Seller to Buyer at the Delivery Point(s). Seller shall have responsibility for and assume any liability with respect to the Gas prior to its delivery to Buyer at the specified Delivery Point(s). Buyer shall have responsibility for and any liability with respect to said Gas after its delivery to Buyer at the Delivery Point(s)."

It appears from those contract provisions that the "contractual point of delivery," on which the department relies, serves the same function as an f.o.b. point. The contractual point of delivery specifies the point to which Powerex was responsible for delivering the natural gas, the point at which title to the gas passed from Powerex to the purchaser, and the point at which responsibility for any loss passed from Powerex to the purchaser.

---

[10] The department cites one exhibit to demonstrate that Powerex sold natural gas with contractual points of delivery in Oregon. That exhibit is a response to the department's request for production of natural gas sales in the 2003 tax year "with a contractual delivery point within Oregon." The exhibit consists of a list of gas sales that Powerex compiled in response to the department's request for production. However, neither the request nor the response contains any explanation of what "contractual point of delivery" means.

[11] In selling natural gas, Powerex entered into confirmation agreements with the purchasers, which incorporated by reference the terms of the standard contracts.

[12] The terms in the two standard form contracts are similar but not identical.

The department identifies no evidence that would suggest some different meaning for those contractual terms, and we conclude that the "contractual points of delivery" on which the department bases its argument are "other conditions of the sale" that are effectively the same as "the f.o.b. point." Put differently, the department's argument is based on "other conditions of the sale" that ORS 314.665(2)(a) directs us to disregard in deciding where the natural gas was delivered or shipped to the purchaser. The conditions of sale on which the department relies provide no reason to reject the Tax Court's conclusion that the natural gas merely passed from one pipeline to another at Malin on its way to purchasers in other states.

The department also relies on two rules that it promulgated to implement ORS 314.665(2)(a). The first rule was in effect when the transactions at issue here occurred. The second rule did not become effective until 2011, several years after the 2003 gas sales at issue here. The first rule provides:

> "Property is delivered or shipped to a purchaser within this state if the shipment terminates in this state, even though the property is subsequently transferred by the purchaser to another state."

OAR 150-314.665(2)-(A)(4). That rule includes the following example to illustrate its application:

> "The taxpayer makes a sale to a purchaser who maintains a central warehouse in Oregon at which all merchandise purchases are received. The purchaser reships the goods to its branch stores in other states for sale. All of taxpayer's products shipped to the purchaser's warehouse in Oregon [are] property 'delivered or shipped to a purchaser within this state.'"

*Id.*

We defer to an agency's interpretation of its own rule "as long as its interpretation is a plausible one and not inconsistent with the rule, its context, or any other source of law." *Crystal Communications*, 353 Or at 311. In our view, the difficulty with the department's reliance on OAR 150-314.665(2)-(A)(4) lies in its application to the facts of this

case. Given the Tax Court's decision, it is difficult to see how the department can say that Powerex's shipments of natural gas "terminate[d]" in Malin. Rather, as the Tax Court concluded, all that occurred at Malin was that the natural gas went from one interstate pipeline to another on its way to purchasers in other states. The department points to nothing in the record that contradicts the Tax Court's conclusion or that suggests that this transaction fell within the example that illustrates how OAR 150-314.665(2)-(A)(4) applies.

The department relies on a second rule, which provides that "[a] sale of tangible personal property, * * * which is delivered or shipped to a purchaser with a contracted point of delivery in Oregon is a sale in this state." OAR 150-314.665(2)-(C)(1). The phrase "contracted point of delivery" can have more than one meaning. It can mean (1) the ultimate destination to which the goods are shipped or delivered to the purchaser by either the seller or by one or more common carriers; (2) the point at which the purchaser takes possession of the goods but not the goods' ultimate destination, as in the loading dock example noted above; or (3) the f.o.b. point or other conditions of the sale. As explained above, in applying OAR 150-314.665(2)-(C)(1) to the gas sales at issue here, the department equates the phrase in the rule "contracted point of delivery" with the f.o.b. point or other conditions of the sale.

The rule, applied to these gas sales, is squarely inconsistent with the statute. That is, the rule, as the department applies it to these gas sales, gives dispositive effect to "conditions of the sale" that ORS 314.665(2)(a) directs us to disregard in deciding where tangible personal property was shipped or delivered to the purchaser. We need not decide whether the department's rule validly can be applied to the second situation identified above (the loading dock example). As the Tax Court concluded, Malin simply served as a transfer point from one "common carrier" to another on the gas's way to the purchaser in another state.[13] The Tax Court

---

[13] The Tax Court ruled that OAR 150-314.665(2)-(C)(1) did not apply to the natural gas sales at issue here because the department adopted that rule after the period in which Powerex's return for the 2003 tax year was "open for examination." *See* OAR 150-305.100-(B) ("Administrative rules adopted by the department, unless specified otherwise by statute or by rule, shall be applicable for

correctly held that Powerex's natural gas sales were not "in this state." *See* ORS 314.665(1).

## II.   ELECTRICITY

Electricity—whatever its physical properties—is sold. Wholesale traders or brokers buy and sell megawatt hours of electricity for specific days or hours.[14] Retailers, and eventually end-users, receive electricity through transmission lines reticulated into a massive network, which is subdivided into regions. The region comprising British Columbia, Washington, Oregon, California, and several other western states is governed by the Western Electricity Coordination Council (WECC). The part of the WECC region that is at issue here is a grid called the Pacific-Northwest Pacific-Southwest Intertie (the Pacific Intertie). The Pacific Intertie consists of alternating-current and direct-current transmission lines, which pass through Oregon on their way from and to other states.

Only a few parties own the transmission lines that make up the Pacific Intertie. Other entities, such as Powerex, purchase the right to use them. In the balancing area in which Oregon is situated, a wholesale trader typically will buy transmission rights from Bonneville Power Administration (BPA), the primary transmission service provider in Oregon.[15]

Situated along the transmission lines are various hubs. The two hubs at issue in this case are referred to as

---

all periods open to examination."). We need not decide whether that procedural ruling provides another basis for affirming the Tax Court's conclusion that the natural gas Powerex sold was delivered or shipped to purchasers in other states. It is sufficient to hold that, even if OAR 150-314.665(2)-(C)(1) applied to the 2003 tax year, applying it to the natural gas sales in this case is inconsistent with ORS 314.665(2)(a).

[14] Because the Tax Court concluded that electricity is not tangible personal property, it did not decide where the electricity that Powerex sold was delivered to the purchasers. In stating the facts, we have set out undisputed facts to put the parties' arguments on that issue in perspective.

[15] A "balancing area" is the area for which a balancing authority—in Oregon, Bonneville Power Administration—"maintains load-resource balance." *See* N Am Elec Reliability Corp, Glossary of Terms in NERC Reliability Standards 10 (last updated June 14, 2014) *available at* http://www.nerc.com/files/Glossary_of_Terms.pdf. Generally, it is coextensive with a federally regulated transmission provider's service area.

the California-Oregon Border (COB) and the Nevada-Oregon Border (NOB). COB consists of four different substations, two of which are in Oregon (Malin and Captain Jack). NOB, by contrast, consists of "[s]ome grass and some dirt" and three wires "cross[ing] over the Nevada-Oregon border." NOB is not a substation but "just a spot in the line at the Nevada-Oregon border where BPA *** hands off responsibility or ownership of the transmission lines to the southern entities."

COB and NOB mark two points on the Pacific Intertie where electricity goes from one transmission system to another. They also play an additional role in this case. The agreements for Powerex's electricity sales at issue here specify a "point of delivery" at either COB or NOB. There was evidence in the record from which the Tax Court could find that the "point of delivery" for the electricity sales was functionally the same as the contractual point of delivery for the natural gas sales; that is, the Tax Court could find that COB and NOB were the points on the Pacific Intertie to which Powerex agreed to deliver electricity, the points at which title to the electricity passed, and also the points where electricity passed from BPA's transmission system to another entity's transmission system on its way somewhere else.

The Tax Court did not decide whether the electricity that Powerex sold was shipped or delivered to purchasers in Oregon or elsewhere.[16] Rather, the Tax Court allocated Powerex's electricity sales a different way. It concluded that electricity is not tangible personal property for the purposes of ORS 314.665(2)(a), which the Tax Court found meant that all of Powerex's electricity sales should be allocated to British Columbia.[17] Given the Tax Court's ruling, we

---

[16] The parties agree that the ultimate destination for a small part of the electricity that Powerex sold was Oregon and thus was "delivered or shipped to a purchaser *** within this state." *See* ORS 314.665(2)(a). They disagree whether the remainder of the electricity was delivered or shipped to purchasers in this state or other states.

[17] Because the Tax Court concluded that electricity is not tangible personal property, it allocated Powerex's electricity sales to the state where the greater part of the income-producing activity occurred. *See* ORS 314.665(4) (specifying that rule for allocating "[s]ales, other than sales of tangible personal property"). The court found that the greater part of the income-producing activity occurred in British Columbia.

describe briefly the competing expert testimony on whether electricity is tangible personal property.

Peter Fisher is the head of the department of experimental particle and nuclear physics at MIT. Powerex called Fisher in support of its argument that electricity is not tangible personal property. Fisher testified that "electricity" is attributed to the behavior of subatomic particles, which he identified as "virtual photons."[18] He explained that, as electrons orbit around the nucleus of an atom, the electrons emit virtual photons, which "propagat[e] through space to [another] point," where the virtual photon is absorbed by a second electron and extinguished. The life of a virtual photon is fleeting; it lasts only for the "time it takes for something to cross an atom at the speed of light." Fisher explained that virtual photons are an electromagnetic field, and electricity is one manifestation of an electromagnetic field. According to quantum physics, virtual photons have no mass. Only electrons, protons, and neutrons (and perhaps related particles) have mass.[19] Because virtual photons have no mass, Fisher concluded that that they are not "material" and that electricity is not "tangible personal property."

Joel Fajans is a professor of physics at the University of California at Berkeley. The department called Fajans to testify in support of its position that electricity is tangible personal property. Fajans testified that an electric current consists of the flow and "pressure" of electrons, which both he and Fisher agreed have mass. He also explained, and Fisher did not dispute, that electricity is perceptible to the senses. It can be felt, smelled, tasted, weighed, measured, and stored (as well as seen by certain kinds of fish). Fajans did not dispute that electromagnetic fields result from photons and

---

[18] We say "attributed" because Fisher was careful to say that virtual photons are "unobservable in any way." Quantum physics postulates the existence of virtual photons to explain other phenomena that can be observed and measured. To date, the observable phenomena have been consistent with the idea both that virtual photons exist and that they have certain characteristics that can be deduced.

[19] Fisher identified several other related particles, which he described using kinship terms: the electron's "silent cousin," the neutrino; the electron's experimental sisters, the muon and the tau (and their related neutrinos); and the apparently unnamed brothers of the up and down quarks, which are found in the nucleus of the atom. Fisher's testimony suggests that some or perhaps all those related particles have mass.

that virtual photons have no mass. However, he explained that, in describing electrical power that is sold and delivered over transmission lines, virtual photons should not be viewed separately from the flow of electrons that constitute electric current. Because electrons have mass and because electricity is perceptible, Fajans testified that electricity is tangible as that word is ordinarily understood.

The Tax Court found Fisher's opinion more persuasive than Fajans', and it concluded, based on Fisher's testimony, that electricity is not "tangible personal property" within the meaning of ORS 314.665. The Tax Court then found that the greater part of the activity that produced the income from Powerex's electricity sales occurred in British Columbia. *See* ORS 314.665(4) (providing that "[s]ales, other than sales of tangible personal property" should be allocated to the state where the greater part of the income-producing activity occurred). As a result, the Tax Court held that the department should not have included any of Powerex's electricity sales in the numerator of the Oregon sales factor. Having found that electricity is not tangible personal property, the Tax Court did not decide whether the electricity that Powerex sold was shipped or delivered to purchasers in this state. *See* ORS 314.665(2)(a).

In considering the Tax Court's ruling, we begin with the question whether electricity is tangible personal property.[20] On that issue, the United States Supreme Court recently has reminded us that whether an object is "tangible" does not necessarily turn on physics or even the object's physical properties; rather, it can depend on the context in which the legislature used the word "tangible." *See Yates v. United States*, ___ US ___, 135 S Ct 1074, 191 L Ed 2d 64 (2015) (plurality opinion) ("any * * * tangible object," as that

---

[20] We start with that question for two reasons. First, the Tax Court did not resolve any of the factual issues related to where the electricity that Powerex sold was shipped or delivered. Second, the parties agree that, if electricity is tangible personal property, a small amount of the electricity that Powerex sold during the tax years at issue here was shipped or delivered to purchasers in Oregon. It follows that, even if we could say that the remainder of the electricity was shipped or delivered elsewhere and thus should not be included in the numerator of the sales factor, we still would have to decide whether the small amount of electricity shipped or delivered to Oregon was tangible personal property and thus attributable to Oregon.

phrase is used in 18 USC § 1519, does not include fish); 135 S Ct at 1089 (Alito, J., concurring in the judgment) (same). We accordingly look to the text, context, and history of ORS 314.665 before deciding what bearing, if any, the subatomic properties of electricity have on the meaning of the phrase "tangible personal property" in our statute.

As noted above, UDITPA uses the "sales factor" to apportion a multistate company's business income among states. ORS 314.650 (providing that business income shall be apportioned by multiplying a company's business income by the sales factor); ORS 314.610(1) (defining "business income").[21] Specifically, UDITPA compares the company's sales within Oregon to the company's total sales to determine a fraction, which is then used to determine the amount of the company's total income that Oregon may tax. ORS 314.665 (specifying how the sales factor is calculated); ORS 314.650 (apportioning a company's business income by multiplying the company's total income by the sales factor).

ORS 314.665 divides a company's sales into two categories: "sales of tangible personal property" and "[s]ales, other than sales of tangible personal property." ORS 314.665(2),(4).[22] It follows from that text that "[s]ales, other than sales of tangible personal property" may include not only sales of

---

[21] ORS 314.625 to ORS 314.645 specify how certain types of nonbusiness income shall be allocated.

[22] ORS 314.665 provides, in part:

"(1) As used in ORS 314.650, the sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period.

"(2) Sales of tangible personal property are in this state if:

"(a) The property is delivered or shipped to a purchaser, other than the United States Government, within this state regardless of the f.o.b. point or other conditions of the sale; or

"(b) The property is shipped from an office, store, warehouse, factory, or other place of storage in this state and the purchaser is the United States Government or the taxpayer is not taxable in the state of the purchaser.

"* * * * *

"(4) Sales, other than sales of tangible personal property, are in this state if (a) the income-producing activity is performed in this state; or (b) the income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance."

intangible property but also other types of sales, such as the sale of services. *See* Hellerstein *et al.*, 1 *State Taxation* ¶ 8.06[3][b] (discussing those two types of "[s]ales, other than sales of tangible personal property"). In this case, Powerex does not dispute that the electricity it sells is "personal property"; that is, it does not argue that, in selling electricity, it was selling a service or something other than personal property. Rather, Powerex's argument turns on the proposition that the electricity it sells is not "tangible" personal property.

UDITPA does not define the phrase "tangible personal property." When the legislature has not defined a word or a phrase, we assume, at least initially, that the word or phrase has its ordinary meaning, except when the words are "'terms of art' *** drawn from a specialized trade or field." *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014). "[W]hen a term [of art] is a legal one, we look to its 'established legal meaning' as revealed by, for starters at least, legal dictionaries." *Id.* "Tangible personal property" is a term of art in the field of taxation, and we look initially to the way that legal dictionaries have defined that phrase as well as intangible property. *See Tektronix, Inc. v. Dept. of Rev.*, 354 Or 531, 543, 316 P3d 276 (2013) (finding a well-defined legal meaning for "intangible assets").

One tax law dictionary defines "tangible personal property" as "[p]roperty with physical form, capable of being touched and seen." *West's Tax Law Dictionary* 1064 (2013). It also includes an entry comparing "tangible and intangible property":

> "Tangible property is property that can be felt or touched. *Its physical features are what make it useful to a taxpayer.* Intangible property is property that is not tangible. Documents that are merely representations of value (such as stock certificates) or evidence of rights (such as patents) are intangible property."

*Id.* (emphasis added).

Ordinarily, we look to dictionaries that were contemporaneous with the statute being interpreted. *West's Tax Law Dictionary* did not exist in 1957 when the Commissioners

on Uniform State Laws adopted the Uniform Act or in 1965 when the Oregon Legislature enacted UDITPA. However, the definitions in that dictionary and its comparison between tangible and intangible property parallel the definitions of those terms in the fourth edition of *Black's Law Dictionary*, which was published in 1951. That dictionary defined "tangible property" as follows: "That which may be felt or touched, and is necessarily corporeal, although it may be real or personal." *Black's Law Dictionary* 1627 (4th ed 1951).[23] It defined "intangible property" as follows:

> "Used chiefly in the law of taxation, this term means such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, and franchises."

*Id.* at 946.

Reading those definitions together, we conclude that tangible personal property is perceptible to the senses and that its physical features make it useful. Conversely, intangible property lacks "intrinsic or marketable value." Thus, even though a bond—a common example of intangible property—physically evidences a debt, the value of the bond does not lie in the physical features of the bond but in the legal obligation that the bond embodies. *See Blodgett v. Silberman*, 277 US 1, 15, 48 S Ct 410, 72 L Ed 2d 749 (1928) (A "bond, wherever actually held or deposited, is only evidence of the debt, and if destroyed, the debt—the right to demand payment of the money loaned, with the stipulated interest—remains.") (internal quotations omitted).

We also look to the statute's context. *Cf. Stevens*, 336 Or at 401 (explaining that the context for interpreting a statute's text includes the preexisting common law and the statutory framework within which the law was enacted). The distinction between tangible and intangible property was a common feature of tax law before the adoption of the Uniform Act in 1957. *See* James M. Gray, *Limitations of the Taxing Power* 57-100 (1906) (discussing the situs of real

---

[23] The fourth edition of *Black's Law Dictionary* defined "corporeal property" as follows: "Such as affects the senses, and may be seen and handled, as opposed to incorporeal property, which cannot be seen or handled, and exists only in contemplation." *Black's Law Dictionary* 412.

property, tangible personal property, and intangible property). Initially, courts sought to assign a real or fictional "situs" to all property, and a state's authority to tax property depended on that situs. The situs of real property was the state in which it was located, as was generally the situs of tangible personal property, unless the tangible personal property was transitory. *See Curry v. McCanless*, 307 US 357, 364-65, 59 S Ct 900, 83 L Ed 1339 (1939) (real property); *Frick v. Pennsylvania*, 268 US 473, 45 S Ct 603, 69 L Ed 1058 (1925) (tangible personal property).[24]

Intangible property posed a greater dilemma. Initially, courts sought to classify different types of intangible property and assign a situs or situses to that property. *See* Gray, *Limitation on the Taxing Power*, 66-95 (discussing situses for, among other things, credits employed in businesses, choses in action that residents owed to nonresidents, and partnership property). For example, a mortgage, bond, or promissory note could be taxed either by the state where the physical evidence of the obligation was situated or by the state in which the owner of the intangible property resided. *Curry*, 307 US at 366-71. The former was justified by the idea that the document evidencing the underlying obligation was physically in the taxing state; the latter, by the idea that personal property follows the owner (at least as long as the personal property was not tangible personal property that had a situs elsewhere). *Id*.

In 1939, the United States Supreme Court recast the constitutional bases on which a state may tax intangible property. *Curry*, 307 US at 363-66. The Court started from the proposition that the rights created by intangible property "are but relationships between persons, natural or corporate, which the law recognizes by attaching to them certain sanctions enforceable in court." *Id*. at 366. Even when a document evidencing those rights existed, a state's constitutional authority to tax that intangible property did not necessarily turn on where that document physically was located. Rather, a state's authority to tax intangible

---

[24] Tangible personal property is movable, and the courts held that tangible personal property that was merely "passing through" a state would not acquire a situs in that state but would be taxable at its owner's domicile. Thomas M. Cooley, 1 *Treatise on the Law of Taxation* 88-89 (3d ed 1903).

property derived from the protection and benefits that the state extended to the owner of the intangible property, which can result, as matter of federal constitutional law, in more than one jurisdiction having authority to tax intangible property. *Id.* at 369-71 (both Alabama and Kentucky could impose a transfer tax on the value of intangible trust assets held by a trustee in Alabama and over which the decedent in Kentucky exercised a power of appointment); *Greenough v. Tax Assessors of Newport*, 331 US 486, 67 S Ct 1400, 91 L Ed 1621 (1947) (Rhode Island could tax a resident trustee's proportionate share of trust intangibles located in New York and held on behalf of a testamentary trust in New York because the benefit and protection of Rhode Island's laws were available to the trustee if the trustee sued or were sued by third parties in Rhode Island).

We draw two conclusions from those cases. First, tangible personal property is property that can be located physically within a state. As the Oregon legislature recognized in UDITPA, tangible personal property can be delivered or shipped from one place to another. Second, intangible property represents or symbolizes obligations and relationships to which the law gives effect. Intangible property rights may be embodied in a physical document, as a promise to pay may be embodied in a bond. However, the value reflected in the bond derives from the promise to pay that the bond embodies; it does not derive from the physical features of the document. *See Blodgett*, 277 US at 15 (so stating). Accordingly, bonds are not considered tangible personal property, even though the bonds—the documents embodying the obligation—can be seen, touched, weighed, and perhaps smelled.

We also look to the legislative history, which does not shed any light on the issue. In enacting UDITPA, the Oregon legislature did not address this issue. Similarly, the comments to the Uniform Act shed no light on the issue. To be sure, as noted above, the comment to section 16 of the Uniform Act and the contemporaneous academic commentary explain that, in defining the sales factor, the Uniform Act sought to give effect to the contribution that "the state of destination, which provides the market, [makes] to the generation of income." Lynn, *The Uniform Division of Income*

*for Tax Purposes Act*, 19 Ohio St LJ at 51; *see also* Keesling and Warren, *California's Uniform Division of Income for Tax Purposes Act Part I*, 15 UCLA L Rev at 161 (same). The sales factor, however, includes both sales of tangible personal property and "[s]ales, other than the sale of tangible personal property." The existence of a market in a state thus provides no basis for distinguishing one category of sales from another. Put differently, the fact that there may be a market for a service does not mean that the sale of that service is the sale of tangible personal property.

With the text and context of ORS 314.665 in mind, we turn to the question whether electricity is tangible personal property for the purposes of that section. In our view, the scientific debate about the subatomic properties of electricity—as fascinating as it is—seems beside the point. For instance, if we applied Professor Fisher's approach to defining tangible personal property (or Professor Fajans' approach for that matter) to instruments that customarily are regarded as intangible property, such as bonds or stock certificates, we would focus on the wrong concepts and conclude wrongly that those instruments are tangible personal property because the subatomic particles of which they are composed have mass. As that counterexample suggests, Fisher's and Fajans' approach to defining tangible personal property focuses on qualities that matter to physicists but not necessarily to lawyers and legislators.

Our examination of the text and context of UDITPA points us in a different direction. It reveals that the qualities that mattered to the drafters of the Uniform Act and the Oregon legislature that enacted UDITPA were whether the property sold was perceptible to the senses, could be located physically within a state, and could be delivered or shipped to a place. A related quality was that the physical properties of tangible personal property were what made it useful while the physical properties of intangible property had little or no relation to that property's value or usefulness. Rather, the value of intangible property derives from the rights and obligations it represents.

We also note that, when the Oregon legislature enacted UDITPA in 1965, tangible personal property and

intangible property generally divided into familiar groups. For example, in another section of the tax code, the Oregon legislature had provided the following examples to define tangible and intangible personal property:

> "'Intangible personal property' or 'intangibles' means and includes money at interest, bonds, notes, claims, demands and all other evidences of indebtedness, secured or unsecured, including notes, bonds or certificates secured by mortgages, and all shares of stock in corporations, joint stock companies or associations."

ORS 307.020(1) (1959). By contrast,

> "'Tangible personal property' means and includes all chattels and movables, such as boats, vessels, merchandise and stock in trade, furniture and personal effects, goods, livestock, vehicles, farming implements, movable machinery, movable tools and movable equipment."

ORS 307.020(3) (1959).

Electricity does not fall neatly into either of those two groups. However, as the issue is presented to us, electricity is either "tangible" personal property or it is "intangible" property. Faced with that choice, we conclude that electricity is tangible personal property for the purposes of ORS 314.665. It is perceptible to the senses, most significantly to the sense of touch. It can be physically located within a state and shipped from one state to another. For example, Powerex sells electricity and delivers a specified quantity of electricity from one state to another. If Powerex fails to deliver a specified quantity of electricity to the purchaser, as it agreed to do, it presumably will be liable for breach of contract. And the physical properties of electricity are what make it valuable to a purchaser, unlike intangible property, the value of which derives from the obligations and rights that the intangible property represents. We accordingly conclude that electricity is tangible personal property for the purposes of ORS 314.665(2)(a).[25]

Powerex argues, however, that two considerations should persuade us to reach a different result. First, Powerex

---

[25] In light of that conclusion, we need not decide whether a department rule defining electricity as tangible personal property applies to the tax years at issue here.

notes that ORS 314.605(2) provides that UDITPA "shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it." Powerex observes that, in interpreting their state counterparts to ORS 314.665, two state tax commissions have concluded that electricity is not tangible personal property. Powerex reasons that, to achieve uniformity, we should reach the same result that those two administrative decisions did. In considering Powerex's argument, we first describe the administrative decisions it cites. We then explain why uniformity, although an important consideration, does not cause us to depart from our conclusion based on the text and context of ORS 314.665.

The California Board of Equalization issued one of the two administrative decisions on which Powerex relies. *See In re Appeal of PacifiCorp*, 2002 WL 31153476 (Cal St Bd Eq). Most of the board's decision consists of a recitation of the parties' competing arguments. *Id.* at *3-*6. The board's ruling turns on its conclusion that the sale of electricity is the sale of a service—a conclusion that the board based primarily on an Ohio Supreme Court decision holding that a distribution system for electricity was a service, not a product, for the purposes of Ohio's products liability law. *Id.* at *7-*8 (quoting and following *Otte v. Dayton Power & Light Co.*, 523 NE2d 835 (Ohio 1988)).

In our opinion, the board's administrative decision provides little support for Powerex's position for three reasons. First, the board's decision rests on a rationale—that electricity is a service—that Powerex does not advance here.[26] Second, the board based its rationale on a case that seems inapposite. In *Otte*, the Ohio case on which the board relied, the plaintiffs alleged that an improper electrical

---

[26] Powerex correctly notes that, at the end of its decision, the board states: "Therefore, based upon the foregoing discussion, we conclude that, for purposes of California tax law, electricity is intangible." *In re Appeal of PacifiCorp*, 2002 WL 31153476 at *8. The "foregoing discussion," however, consists of the board's explanation that electricity is a service. *Id.* at *7-*8. It is certainly true that, for purposes of California's analogue to ORS 314.665, the sale of "tangible personal property" does not include either the sale of a service or the sale of intangible property. However, the sale of a service differs from the sale of intangible property, and the board's conclusion that electricity is a service does not imply that it is intangible property.

ground had adversely affected their cows' milk production and that the improper ground was a defective product for the purposes of products liability law. 523 NE2d at 838.[27] The Ohio Supreme Court held in *Otte* that the "purported defect" that caused the plaintiffs' cows not to produce milk was "a defect in the distribution system [for grounding electricity]. Such a system is, in our view, a service." *Id.* Whether a distribution system for electricity is a service for the purposes of products liability law would seem to have little, if any, bearing on whether electricity is tangible personal property or intangible property for the purposes of apportioning the income of a multistate corporation. Finally, as the *amicus* notes, to the extent that *Otte* holds that electricity is not a product for the purposes of product liability law, *Otte* does not reflect the majority view on that issue. *See Bryant v. Tri-County Elec. Membership Corp.*, 844 F Supp 347, 350 n 6 (WD Ky 1994) (collecting cases).

The Massachusetts Appellate Tax Board issued the other administrative decision on which Powerex relies. *See Eua Ocean State Corp. v. Comm'r of Revenue*, 2006 Mass Tax LEXIS 35 (Mass Tax 2006). That decision seems more to the point than the California Board of Equalization's opinion in *PacifiCorp*. In *Eua*, the board concluded that electricity has some physical features, but "lacks physical form and a precise geographic location" and makes "concepts such as title, possession, and delivery, which are the lynchpins of apportionment for sales of tangible personal property" difficult to analyze in the sales factor context. *Id.* at *45. Additionally, the board was persuaded by the fact that the physical properties of electricity differ from the physical properties of other tangible personal property, such as "furniture, a cooking utensil, or a book." *Id.* at *41.

Although we appreciate the reasons that the board advanced in support of its holding in *Eua*, we come to a different conclusion for the reasons that we previously have stated. We find that the "concepts of title, possession, and

---

[27] Specifically, the plaintiffs had alleged in *Otte* that, as a result of "small amounts of stray neutral-to-earth voltage [that] had been released on their property," their cows had reacted adversely to the milking machines, with the result that the cows "were 'dancing in the [milk] parlor, *** kicking the [milk] unit off the cow, [and] coming into the parlor nervous ***.'" 523 NE2d at 836.

delivery" can and do apply to sales of electricity. Indeed, contracts for the sale of electricity routinely define and embody agreements on those terms. Moreover, we find it less relevant that electricity is the product of excited electrons that are fungible than that electricity can be measured and identified by a well-recognized unit of sale and delivered, for commercial purposes, to purchasers to service their load within a particular state. It is certainly true that electricity differs from furniture, but it also differs from bonds, stock certificates, and other intangible property. As explained above, the qualities that distinguish tangible personal property from intangible property lead us to conclude that electricity should be classified as tangible rather than intangible property for the purposes of ORS 314.665.

We are left, however, with Powerex's argument that, even if we are unpersuaded by the reasoning in *Eua* and even if the reasoning in *PacifiCorp* is inapposite, we should nonetheless follow those two administrative decisions to achieve uniformity among the states that have adopted their own analogues to UDITPA. *Amicus* Portland General Electric counters that, in the context of income tax determinations, two state courts have held that electricity is tangible personal property. *See Exelon v. Dep't of Rev.*, 917 NE2d 899, 911 (Ill 2009) (joining the "several courts that have expressly held in varying contexts that electricity constitutes 'tangible personal property'"); *Tucson Electric Power Co. v. Arizona Dep't of Rev.*, 822 P2d 498, 502 (Ariz Ct App 1991) ("Electricity is personal property that may be measured; it thus constitutes 'tangible personal property.'"). The *amicus* recognizes that those courts were not interpreting UDITPA but reasons that their conclusions regarding the tangible nature of electricity apply equally to UDITPA.

We might doubt the persuasiveness of the courts' reasoning in *Exelon* and *Tucson Electric Power*, even though we agree with the result that those courts reached.[28] The

---

[28] The Illinois Supreme Court's holding in *Exelon* turns primarily on Professor Fajans' explanation of electricity and the fact that electrons have mass. As explained above, we are not persuaded that the meaning of the phrase "tangible personal property" in UDITPA turns on how quantum physicists explain the subatomic workings of electricity. The holding in *Tucson Electric* is brief. The parenthetical set out above contains the court's reasoning on the issue.

more telling question, however, is the extent to which the goal of uniformity should inform our interpretation of Oregon's statute. We addressed that question in *Atlantic Richfield Co. v. Dept. of Rev.*, 300 Or 637, 646, 717 P2d 613, *adh'd to on recons*, 301 Or 242, 722 P2d 727 (1986), and we turn to that opinion. The issue in *Atlantic Richfield* was whether the Oregon Department of Revenue reasonably had interpreted its own rule. 300 Or at 644-46. The court observed that the department's interpretation of its own rule was legally permissible but not persuasive. *See id.* at 646 (explaining that the two rationales that supported the department's interpretation of its rule "seem[ed] suspect" while the four rationales that supported a different interpretation had "validity").

The court explained that, if no other state had addressed the issue, it would defer to the department's interpretation of its rule despite any misgivings the court may have had. *Id.* However, because the three other states that had addressed the issue had all reached the same result, which differed from the department's conclusion, this court did not defer to the department. *Id.* at 646-50. Put differently, given the department's doubtful interpretation of its own rule, this court opted for a small but uniform consensus among the states that had considered the issue. On reconsideration, the court adhered to its earlier conclusion after engaging in a more comprehensive survey of other states' positions on the issue. 301 Or at 246-47. The court noted that 19 of the 30 UDITPA states that had considered the issue had disagreed with the department's interpretation and that 10 of the 13 Multistate Tax Compact states that had taken a position on the issue disagreed with the department's interpretation. *Id.* at 245.

As we read the original decision in *Atlantic Richfield* and the decision on reconsideration, we conclude that the weight that should be given to the uniform application of UDITPA is a function of two variables. The first involves our degree of certainty regarding the meaning of the statute or rule we are interpreting. The second involves the degree of consensus that other states considering the same issue have reached. For example, if a statute may be interpreted in two equally plausible ways and if there is a general consensus

among the other UDITPA states that one of those interpretations is correct, then uniformity weighs in favor of interpreting the statute the same way that the other UDITPA states have. Conversely, if we are confident that the text, context, and legislative history of a statute lead to a single conclusion, one or two stray decisions going the other way will be unlikely to cause us to follow those states' interpretations.

In this case, our examination of the text, context, and history of ORS 314.665 persuades us that the phrase "tangible personal property" includes electricity. Although no conclusion is free from doubt, we are persuaded that our interpretation more accurately reflects the meaning of ORS 314.665. The consensus on which Powerex relies to support a different conclusion consists of two administrative decisions, each of which rests on a different rationale. Moreover, other states have reached a contrary result. *See Exelon*, 917 NE2d at 911 (listing the "several courts" that had concluded that electricity is tangible personal property). If we were less certain about our interpretation and if there were a greater consensus among the states reaching a different result, the goal of achieving a uniform interpretation might lead to a different answer. That is not the case here, however.

Powerex advances another consideration in support of the conclusion it urges. It argues that we should defer to the version of the Multistate Tax Commission (MTC) audit manual that was in effect for the three tax years at issue here. Powerex argues that it is "*highly* significant that the MTC treats electricity as an *intangible* for the purposes of the UDITPA sales factor." (Emphasis in original.) Powerex, however, never explains why that is so, and we turn to the audit manual on which Powerex relies.

The section of the audit manual on which Powerex relies states:

> "The rules set forth in Index 1720 [for allocating sales of tangible personal property] do not apply to sales of real estate, services, or intangibles. Tangible [personal] property is defined as commodities that are perceptible to the senses and movable. It is usually discernible from intangible property. However, some property is borderline and difficult to identify as to type. For example, water and gasoline are

considered to be tangible property, while electricity and money are considered to be intangible property."

The audit manual states a position regarding electricity but does not explain the basis for that position. That is, having defined "tangible property" as "commodities that are perceptible to the senses and movable," the audit manual does not explain why electricity does not come within that definition. Rather, the manual notes that the issue is "difficult" and posits, without further explanation, that electricity is "intangible property."

In our view, the audit manual is not as significant as Powerex perceives. It is certainly not significant for its persuasive value. The audit manual does not explain its conclusion; it states it. Nor is the audit manual significant because it preexisted Oregon's enactment of UDITPA in 1965 and thus might have informed the Oregon legislature's understanding of what was and was not "tangible personal property." The MTC did not come into existence until 1967, two years after Oregon enacted UDITPA, and the MTC did not begin any audits until 1971, six years after Oregon enacted UDITPA.[29] We recognize that the audit manual seeks to promote consistency among the states that have signed on to the Multistate Tax Compact. However, UDITPA states that, if any of its provisions conflict with the provisions of the Multistate Tax Compact, which Oregon has adopted, then the provisions of UDITPA control. ORS 314.606.[30] The same principle applies with greater force to conflicts between UDITPA and the various sections of MTC's audit manual. To the extent that the audit manual differs from our interpretation of ORS 314.665(2)(a), our interpretation of UDITPA controls.

---

[29] *See* First Annual Report of the Multistate Tax Commission (1967-68) (explaining that the report "includes the activities of the Commission during the partial first year of its existence in 1967"); Fourth Annual Report of the Multistate Tax Commission 8-9 (1971-72) (explaining that, in 1971, the MTC opened audit offices in two cities). Although the MTC provided audits for companies, the report does not suggest that an "audit manual" also existed in 1971.

[30] ORS 314.606 provides: "In any case in which the provisions of ORS 314.605 to ORS 314.675 are inconsistent with the provisions of ORS 305.653, the provisions of ORS 314.605 to ORS 314.675 shall control." ORS 314.605 to ORS 314.675 comprise UDITPA while ORS 305.653 is the statute by which Oregon enacted the Multistate Tax Compact into law and entered into that compact with other states.

The arguments that Powerex has advanced do not persuade us to depart from our conclusion that electricity is tangible personal property for the purposes of ORS 314.665(2)(a). It follows that the remaining question is whether Powerex delivered or shipped the electricity it sold to purchasers in Oregon or in other states. As noted, the Tax Court did not decide that issue. As also noted, the parties agree that Oregon was the ultimate destination for a small part of the electricity that Powerex sold during the three tax years at issue here. They disagree whether the remainder of the electricity that Powerex sold during those years was shipped or delivered to purchasers outside of Oregon.

In arguing that issue, the department does not distinguish between Powerex's sales of electricity and its sales of natural gas, and it may be that the department's arguments regarding Powerex's sales of electricity fail for the same reason that its arguments regarding Powerex's sales of natural gas failed. However, the Tax Court did not find whether the transmission systems that carried the electricity that Powerex sold functioned the same way that natural gas pipelines did. That is, the Tax Court did not find whether those transmission systems were the functional equivalent of common carriers. If the Tax Court makes that finding on remand, then our conclusion regarding Powerex's natural gas sales presumably will control how most of Powerex's electricity sales will be allocated. However, if the Tax Court finds that COB and NOB functioned more like a loading dock, then it will have to decide whether, under UDITPA, Oregon will follow the majority or the minority position on that issue. We accordingly affirm the Tax Court's judgment regarding Powerex's natural gas sales, reverse its judgment regarding Powerex's electricity sales, and remand for further proceedings.

The judgment of the Tax Court is affirmed in part and reversed in part. The case is remanded for proceedings consistent with this opinion.