222                    August 1, 2016                    No. 25

IN THE OREGON TAX COURT
REGULAR DIVISION

POWEREX CORPORATION,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 4800)

Upon remand of the case from the Oregon Supreme Court, the parties took different positions on the scope of remand and the remaining issues for the Tax Court to decide as to treatment of receipts from sales of electricity in the computation of the sales factor for purposes of apportionment of income subject to tax in Oregon. Defendant Department of Revenue (the department) argued for the record to be reopened as to the issue of the sourcing of receipts from the sales of tangible personal property. Adhering to the original record of the case, and the context set out by the Supreme Court, the court held that the "point of delivery" for the electricity sales at issue was functionally the same as the contractual point of delivery for the natural gas sales. The court further held that no transmission of electricity occurred in respect of "book-out" transactions, and that the position of taxpayer as to treatment of book-outs was correct and that of the department was erroneous, and there was no basis for the department's assessment of penalties in the case.

Submitted on the parties' briefing as to scope of remand.

J. Clifford Gunter, Bracewell & Giuliani, LLP, Houston, filed the brief *Pro Hac Vice* for Plaintiff (taxpayer).

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed the brief for Defendant Department of Revenue (the department)

Decision rendered August 1, 2016.

**HENRY C. BREITHAUPT, Judge.**

I.   INTRODUCTION

This matter is before the court on remand from the Oregon Supreme Court. *Powerex Corp. v. Dept. of Rev.*, 357 Or 40, 346 P3d 476 (2015). The question is the proper treatment of receipts from sales of electricity in the computation of the sales factor for purposes of apportionment of income subject to tax in Oregon. It has been settled that,

for purposes of ORS 314.665, sales of electricity are sales of tangible personal property.[1]

The parties have engaged in hearings with the court and briefing on the scope of proceedings on remand, including whether further evidence should or must be taken, and the substantive differences between the positions of the parties.

## II.   ISSUES

The issues remaining for decision are:

(1)   Should the record in this case be reopened?

(2)   In what state are the gross receipts at issue in this case considered to arise?

(3)   What is the proper treatment of book-out transactions?

(4)   Were penalties assessed against taxpayer validly assessed?

A.   *The Record for Decision*

The court is of the opinion that any reopening of the existing record in this case is unwarranted. In the trial of this case, both parties had an opportunity to first address and present facts on the question of the nature of electricity. Both parties also had a full opportunity to make a factual record and present arguments as to how the sales factor for Plaintiff (taxpayer) should be apportioned if, as is now settled, electricity is treated as the sale of tangible personal property.

This case has, from its inception, involved a deficiency asserted and assessed by Defendant (the department) on the basis of the receipts from certain specifically identified sales in the years in question. The position of the department in its administrative and litigation actions was that the particular sales involved the delivery of tangible personal property to a "purchaser within this state," at particular locations near Malin, Oregon, designated COB and

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2001.

NOB.[2] The deficiency assessment did not include an alternative amount calculated on the basis of other identified sales or other legal theories, or both.

Further, the department had full opportunity to introduce evidence and make legal arguments as to the consequences that would follow if its position on the nature of electricity was accepted, as it ultimately was by the Oregon Supreme Court. The position of the department in this court was that electricity was tangible personal property and the contractual point of delivery determined the place where electricity was delivered and hence the place for sourcing of the gross receipts. No other facts or theory were presented. Taxpayer had anticipated that possible result in the prior proceedings in this court. It argued that, if, contrary to its main argument, electricity were to be considered tangible property, receipts from taxpayer's sales of electricity should be sourced to the location of the contractual counterparty. For most of the sales in question, the location of the contractual counterparty was in California. Some of the counterparties were located in Oregon, and taxpayer conceded that receipts from those sales would be properly sourced to Oregon if electricity was determined to be tangible personal property. Taxpayer argued that this result was consistent with the Uniform Division of Income for Tax Purposes Act (UDITPA) rule and that conclusion was not affected by the so called "dock-sale" rule.

Now, faced with the fact that the position presented by it as to the nature of electricity has been accepted, the department wishes to entirely revisit the only arguments it made in this case as to the sourcing of receipts from the sales of tangible personal property. The department wishes to reopen the entire record and make a case based on either (1) an argument about "point of physical delivery" rather than "point of contractual delivery," or (2) an argument that taxpayer's tax liability should be based on consideration of a set of contracts that has not in any way served as a basis for its audit findings or litigation position.[3] The court sees

---

[2] COB and NOB are acronyms for California/Oregon border and Nevada/Oregon border.

[3] These contracts would be those in which taxpayer took title to electricity at points outside of Oregon but delivered such electricity to customers located

no reason to allow the department to belatedly attempt to prove facts and make legal arguments that did not serve as the basis for its assessment and were not raised by it as an alternative position to apply if its contractual point of delivery theory was rejected.

Accordingly, the record in this matter will not be reopened. The court will proceed to consider the proper resolution of this case on the basis of the facts in the record from the prior proceeding in this court and positions argued in the supplemental briefing on legal questions that has been allowed by this court.

B.  *Source of Receipts at Issue—Observations of Supreme Court*

The Supreme Court rejected the department's position that the delivery of electricity occurred at the contractual point of delivery. It then remanded the case to this court, making findings and observations in respect of the record before it that serve as an important context for this court's considerations and analysis:

"COB and NOB mark two points on the Pacific Intertie where electricity goes from one transmission system to another. They also play an additional role in this case. The agreements for Powerex's electricity sales at issue here specify a 'point of delivery' at either COB or NOB. There was evidence in the record from which the Tax Court could find that the 'point of delivery' for the electricity sales was functionally the same as the contractual point of delivery for the natural gas sales; that is, the Tax Court could find that COB and NOB were the points on the Pacific Intertie to which Powerex agreed to deliver electricity, the points at which title to the electricity passed, and also the points where electricity passed from BPA's transmission system to another entity's transmission system on its way somewhere else.

in Oregon. The department, now recognizing that the location of the purchaser, the position most consistent with ORS 314.665, will most likely be accepted as determinative, wishes to undertake discovery and have the record opened. It would hope to, in effect, revise its deficiency assessment so as to jettison the only position it maintained so far in this case—that receipts are sourced to the point of title passage. It would substitute for that a deficiency determined on sales transactions that were no part of its audit and deficiency assessment from which the taxpayer appealed.

"*****

"As we read the Tax Court's opinion, it found that Malin was simply the point at which the natural gas that Powerex sold went from one pipeline to another pipeline on its way to its ultimate destination outside of Oregon. More importantly, the Tax Court analogized the role that the pipelines played to that of common carriers. It explained that 'it appears that the gas in question is being transmitted over interstate pipelines that are, or function as, common carriers.' Given the Tax Court's findings, we conclude that this case does not require us to decide what the rule should be when the purchaser takes physical possession of the goods at a loading dock in one state and transports them itself to their ultimate destination in another state. Rather, this is a case in which the natural gas merely went from one 'common carrier' to another at Malin on the gas's way to the purchaser in California. The department identifies no case in which any court has held that such a transfer constitutes a 'delivery' to the purchaser within the meaning of UDITPA or its analogues in other states.

"It appears from those contract provisions that the 'contractual point of delivery,' on which the department relies, serves the same function as an f.o.b. point. The contractual point of delivery specifies the point to which Powerex was responsible for delivering the natural gas, the point at which title to the gas passed from Powerex to the purchaser, and the point at which responsibility for any loss passed from Powerex to the purchaser.

"The department identifies no evidence that would suggest some different meaning for those contractual terms, and we conclude that the 'contractual points of delivery' on which the department bases its argument are 'other conditions of the sale' that are effectively the same as 'the f.o.b. point.'

"*****

"In our view, the difficulty with the department's reliance on OAR 150-314.665(2)-(A)(4) lies in its application to the facts of this case. Given the Tax Court's decision, it is difficult to see how the department can say that Powerex's shipments of natural gas 'terminate[d]' in Malin. Rather, as the Tax Court concluded, all that occurred at Malin was that the natural gas went from one interstate pipeline

to another on its way to purchasers in other states. The department points to nothing in the record that contradicts the Tax Court's conclusion or that suggests that this transaction fell within the example that illustrates how OAR 150-314.665(2)-(A)(4) applies.

"The arguments that Powerex has advanced do not persuade us to depart from our conclusion that electricity is tangible personal property for the purposes of ORS 314.665(2)(a). It follows that the remaining question is whether Powerex delivered or shipped the electricity it sold to purchasers in Oregon or in other states. As noted, the Tax Court did not decide that issue. As also noted, the parties agree that Oregon was the ultimate destination for a small part of the electricity that Powerex sold during the three tax years at issue here. They disagree whether the remainder of the electricity that Powerex sold during those years was shipped or delivered to purchasers outside of Oregon.

"In arguing that issue, the department does not distinguish between Powerex's sales of electricity and its sales of natural gas, and it may be that the department's arguments regarding Powerex's sales of electricity fail for the same reason that its arguments regarding Powerex's sales of natural gas failed. However, the Tax Court did not find whether the transmission systems that carried the electricity that Powerex sold functioned the same way that natural gas pipelines did. That is, the Tax Court did not find whether those transmission systems were the functional equivalent of common carriers. If the Tax Court makes that finding on remand, then our conclusion regarding Powerex's natural gas sales presumably will control how most of Powerex's electricity sales will be allocated. However, if the Tax Court finds that COB and NOB functioned more like a loading dock, then it will have to decide whether, under UDITPA, Oregon will follow the majority or the minority position on that issue."

*Powerex Corp.*, 357 Or at 52-73.

## C.   *Source of Receipts: Findings of This Court*

Within the context established by the Supreme Court set out above, this court makes the following findings of fact based on the record the court has before it:

(1)   The "point of delivery" for the electricity sales was functionally the same as the contractual point of delivery for the natural gas sales. COB and NOB were the points on the Pacific Intertie to which Powerex agreed to deliver electricity, the points at which title to the electricity passed, and also the points where electricity passed from BPA's transmission system to another entity's transmission system on its way somewhere else. COB and NOB are sometimes referred to as "hubs."

(2)   COB and NOB were simply the points at which the electricity that Powerex sold went from one transmission system to another transmission system on its way to its ultimate destination outside of Oregon. Under the contractual sales on which the department's assessment was based, the purchaser did not take physical delivery of electricity at COB or NOB. There was no delivery of electricity within the meaning of UDITPA or its analogues in Oregon and other states. There is no need to address the application of the dock-sales rule.[4]

(3)   All that occurs at COB and NOB in respect of electricity is passage of title, responsibility for loss and, in some cases those locations serve to as a basis for allocation of responsibility for transmission charges by the common carrier. The contractual points of delivery for electricity serve the same function as an f.o.b. point.

(4)   The transmission of electricity did not terminate at COB or NOB within the permissible meaning of OAR 150-314.665(2)-(A)(4). What occurred at those points was the passage of electricity from one transmission system to another, with each such transmission system, by law, being either common carriers or functionally equivalent to common carriers.[5]

---

[4] With this conclusion the department explicitly agrees. "'Dock sale' describes a sale of merchandise that is picked up by the purchaser at the seller's 'dock' or in-state warehouse and then driven to a location out-of-state. These facts do not exist in the present situation: Powerex has no dock in Oregon, and purchasers are not loading a truck with electricity and driving it anywhere."

[5] Both parties acknowledge that the Intertie transmission system along the Pacific coast is governed by the provisions of FERC Order 888, 18 CFR § 35 (1996). That order clearly establishes that the entities providing transmission of electricity on the Intertie are or function as common carriers.

(5)   The purchasers to whom taxpayer sold under the contracts at issue in this case were not located in Oregon, with the exception of those contracts in respect of which both parties agree sales were to purchasers in Oregon. The vast majority of the sales in these years were to California Department of Water Resources (CDRW), an entity in California.

(6)   At COB and NOB there were no facilities maintained by or for taxpayer, or any of its counterparties, for the use or storage of electricity, nor was any electricity diverted from the transmission systems for use by taxpayer, any counterparties, or any third parties.

(7)   At all times after delivery of electricity by taxpayer to the Pacific Intertie, electricity continued to flow within or along the Pacific Intertie until delivery to a counterparty.

(8)   The counterparties under the contracts at issue in this case did not take delivery of the tangible personal property, store it, and reship it to other locations outside of Oregon.

(9)   Electricity transmitted to COB and NOB does not "come to rest" at such hubs.

D.   *Analysis and Conclusions*

The department has argued and then abandoned several positions in this case. Initially it argued that delivery of electricity occurred in this case at the contractual point of delivery. That position was rejected by the Supreme Court as inconsistent with the governing statute because it was essentially the point where title passes and, by law, that is to be irrelevant in the sourcing of gross receipts.

In its most recent post-remand briefing, the department appears to argue that its focus should be on the point of physical delivery rather than the contractual point of delivery. There are, however, a number of problems with this argument:

(1)   In most, if not all, cases the point of physical delivery, as the department considers that term, is also the point of contractual delivery.

(2)   With respect to NOB, that "point" is literally a place on the transmission line, on each side of which is simply more line and under and around which is dirt and a few plants.

(3)   With respect to COB, what the department considers to be the point of physical delivery is a substation which serves to connect the transmission lines of two transmission providers who function as common carriers of electricity. At this substation, there are no facilities maintained by taxpayer's contract counterparty. There are no facilities for use, storage or diversion of electricity at COB.

(4)   In its briefing on remand the department first asserted that electricity "came to rest" at the trading hubs. In its next brief the department concedes that at COB and NOB electrons keep flowing along the transmission line but the "transaction" comes to rest.[6]  The problem with the department's assertions about transactions coming to rest is simply that they have no basis in either the relevant statute nor even in the department's interpretive rules. Those rules correctly reflect the statutory concern about where tangible personal property comes to rest. Those rules do not in any way speak to where, or even if, a transaction can or does come to rest.

(5)   The department appears to support its position by arguing that most of taxpayer's sales at COB and NOB were to wholesale traders. The department fails to explain why it would matter that a sale of tangible personal property was to a wholesale buyer as opposed to a retail buyer. There is no such distinction in the statutes and rules of the department with respect to computation of the sales factor.

(6)   The record shows that the vast majority of the sales at issue in the department's assessment were made to CDWR, a California based entity that serves under California law to address the problems of power crises in California and for Californians.

---

[6] "The market transaction 'comes to rest,' [at the trading hub] even though the electrons never stop moving."

(7)   In the view of the department, a buyer from taxpayer takes physical delivery of electricity at a trading hub and then ships it on to another location. The department states that this situation is governed by OAR 150-314.665(2)-(A)(4). That rule provides:

> "Property is delivered or shipped to a purchaser within this state if the shipment terminates in this state, even though the property is subsequently transferred by the purchaser to another state.

> "*Example 4:*  The taxpayer makes a sale to a purchaser who maintains a central warehouse in Oregon at which all merchandise purchases are received. The purchaser reships the goods to its branch stores in other states for sale. All of taxpayer's products shipped to the purchaser's warehouse in Oregon is property 'delivered or shipped to a purchaser within this state.'"

However, as the court's findings of fact show, no party purchasing electricity from taxpayer maintained a warehouse or any analogue to a warehouse for the storage, even for an instant, of electricity sold by taxpayer.

(8)   Rather, the "hub" is a trading or contractual notion, not a place of physical delivery. The hub serves a role of allowing contract parties to allocate risk of loss and responsibility for transmission costs to and from the hub. The hub is notional or conceptual and serves to permit contract parties to nominate or express other contract terms. In this way, reference to delivery at a hub is no different than an f.o.b. term which, by statute, is to be ignored in determining the source of receipts under ORS 314.665.

(9)   The shipment of electricity under the contracts at issue in this case does not terminate in Oregon. The statute and rules of the department dictate that a shipment of tangible personal property that does not terminate in Oregon such that the property comes to rest in Oregon is to be treated as a sale at the location of the purchaser. On this record, the shipments of electricity at issue terminated in states other than Oregon, except as to sales that both parties agree occurred in Oregon.

E.   *Other Remaining Issues*

   1.   *Book-outs*

The remand after the holding of the Supreme Court on the nature of electricity also requires a decision as to the treatment of so-called "book-out" transactions. On the record made in this proceeding, no transmission of electricity occurs in respect of such transactions. The position of taxpayer as to treatment of book-outs is correct and that of the department is erroneous.

   2.   *Penalties*

The issues in this case and the history of the resolution of those issues in this case demonstrate that there is no basis for the department's assessment of penalties in this case.

The parties are directed to confer as to a judgment that reflects the foregoing. Now, therefore,

IT IS ORDERED that parties confer as to judgment in this matter.