No. 15 December 16, 2020 327

IN THE OREGON TAX COURT
REGULAR DIVISION

ORACLE CORPORATION
AND SUBSIDIARIES
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5340)

On cross-motions for partial summary judgment, Plaintiff argued that ORS 317.267(3) impliedly includes, in Plaintiff's Oregon sales factor, the unsubtracted 20 percent of dividends and Subpart F income from Plaintiff's wholly owned controlled foreign corporations. Defendant rejected Plaintiff's interpretation of ORS 317.267(3) and asserted that Plaintiff was required to exclude the unsubtracted 20 percent from the sales factor under ORS 314.665(6)(a). After examining the text, context, and legislative history of ORS 317.267(3), the court rejected Plaintiff's argument because the statute was not intended to address the inclusion or exclusion of the unsubtracted 20 percent at issue. In a portion of the decision later overturned on reconsideration, the court concluded that ORS 314.665(6)(a) does not apply to the Subpart F income because that income did not constitute "gross receipts." *Oracle Corp. and Subsidiaries v. Dept. of Rev.*, 24 OTR 359 (2021) (*Oracle II*).

Oral argument on cross-motions for partial summary judgment was held November 25, 2019, in the courtroom of the Oregon Tax Court, Salem.

Eric J. Kodesch, Schwabe, Williamson & Wyatt PC, Portland, filed the motion and argued the cause for Plaintiff.

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant Department of Revenue.

Decision rendered December 16, 2020.

## ROBERT T. MANICKE, Judge.

In this corporation excise tax appeal, Plaintiff (collectively, taxpayer) and Defendant (the department) cross-move for summary judgment regarding whether taxpayer may include in its sales factor, for apportionment purposes, amounts that are subtracted from federal taxable income pursuant to ORS 317.267(2) and are not

expressly excluded from the apportionment formula by ORS 317.267(3).[1]

## I.   FACTS

The following facts are not disputed. Taxpayer's common parent, Oracle Corporation, is a Delaware corporation whose commercial domicile is in Redwood Shores, California. Oracle Corporation has many domestic and foreign subsidiaries. On behalf of itself and certain domestic subsidiaries, Oracle Corporation filed consolidated federal income tax returns for the tax years ending May 31, 2010, 2011, and 2012 (the "Years at Issue"). Some or all of those domestic subsidiaries also were included in Oregon consolidated returns that Oracle Corporation filed for the Years at Issue. The corporations joining in the Oregon consolidated returns were engaged collectively in a single unitary business that involves software. *See* ORS 317.710(5)(a).

During the Years at Issue, taxpayer conducted its software business in foreign countries and jurisdictions through a network of wholly owned "controlled foreign corporations" (CFCs). Some of the CFCs paid dividends to various members of the group comprising taxpayer, and taxpayer included those dividend amounts (the "Dividends") in its consolidated federal taxable income. In addition, taxpayer also included in its federal taxable income certain amounts that were calculated based on various data related to taxpayer's CFCs, but that were not paid to taxpayer; these amounts were required to be included pursuant to subpart F of the Internal Revenue Code (IRC or the Code), IRC sections 951-965.[2] The court, applying the term defined in the Code, refers to these includible amounts of taxpayer as the "Subpart F Income." *See* IRC § 952(a) (defining "Subpart F Income"). As is common in tax literature, the parties sometimes refer to the Subpart F Income amounts as "deemed dividends." *See, e.g.*, Postlewaite, Cameron & Kittle-Kamp, *Federal Income Taxation of Intellectual Properties & Intangible Assets* ¶ 14.08[2] (Nov 2020) ("The sum of these [subpart F] income categories is imputed to the CFC's United States

[1] Unless otherwise noted, references to the Oregon Revised Statutes (ORS) are to the 2009 edition.

[2] Unless otherwise noted, citations to the Code are to the 2012 edition.

shareholders as a deemed dividend to the extent of the CFC's earnings and profits. This deemed dividend is subject to tax at ordinary income rates, even though such income has not been received by the shareholders.").

Taxpayer treated the Subpart F Income and the Dividends as "dividends *** received or deemed received" for purposes of the subtraction allowed by ORS 317.267, commonly referred to as Oregon's "dividends-received deduction" statute. Applying that statute, taxpayer subtracted 80 percent of the Subpart F Income and 80 percent of the Dividends in computing taxpayer's Oregon taxable income.[3] *See* ORS 317.267(2). The department does not contest that ORS 317.267 applies to both categories of taxpayer's income from the CFCs and that taxpayer was entitled to subtract 80 percent of both. *See former* OAR 150-317.267-(B)(4) (2012) ("Unlike the federal dividend received deduction, the Oregon deduction is permitted on dividends received or deemed received from foreign as well as domestic corporations. Income included in federal taxable income pursuant to IRC [s]ection 951(a) qualifies for the [dividends-received] deduction. Such income is a dividend 'deemed received.'"). Consistent with ORS 317.267(3), taxpayer also excluded the 80 percent amount from its sales factor when apportioning its business income to Oregon.

## II.   ISSUE

At issue is the effect, if any, of the remaining ("unsubtracted") 20 percent of the Subpart F Income and the unsubtracted 20 percent of the Dividends on taxpayer's Oregon sales factor.

## III.   PARTIES' POSITIONS

Taxpayer seeks to include the unsubtracted 20 percent of the Subpart F Income and the unsubtracted 20 percent of the Dividends in its Oregon sales factor, contending that these amounts are "sales" under ORS 314.665. On its returns, taxpayer included the unsubtracted amounts only

---

[3] Although disputed in the briefs, the parties agreed at oral argument on these motions that, under ORS 317.267(2), the proper percentage of the Oracle Dividends to be excluded from the apportionment factor is 80 percent for all of the years at issue. *See* ORS 317.267(2)(b).

in the denominator; it did not include the unsubtracted amounts in the numerator of its Oregon sales factor, because it concluded that the amounts were not "in this state." Taxpayer argues that the provision that caused it to exclude 80 percent of the Subpart F Income and 80 percent of the Dividends from its sales factor, ORS 317.267(3), also implies that taxpayer must include the unsubtracted 20 percent in its sales factor. Taxpayer seeks partial summary judgment on that issue.

The department rejects taxpayer's interpretation of ORS 317.267(3). The department also argues affirmatively in its cross-motion that a provision of the sales factor statute applicable to taxpayer, ORS 314.665(6)(a), *requires* taxpayer to exclude the unsubtracted 20 percent of the Subpart F Income and the unsubtracted 20 percent of the Dividends from the sales factor.

## IV.   LEGAL BACKGROUND

This case involves the interplay among Oregon's consolidated return regime, Oregon's modification of "taxable income" as determined under federal law, and the Oregon sales factor for apportioning the income of a group of corporations engaged in the same unitary business. The court therefore starts by laying out in sequence the six main steps to determine the Oregon taxable income of a multinational group of corporations, focusing on the steps at which the "dividends-received deduction" and the apportionment formula apply. *See generally StanCorp Financial Group, Inc. v. Dept. of Rev.*, 21 OTR 120 (2013); *Costco Wholesale Corp. v. Dept. of Rev.*, 20 OTR 537 (2012); *US West / Qwest Dex Holdings v. Dept. of Rev.*, 20 OTR 342 (2011).

Since 1986, the first step to determine the Oregon taxable income of a corporation has been to determine its "taxable income" under federal income tax law. Or Laws 1984, ch 1, § 5(10) (Spec Sess) (incorporating "taxable income" as defined under federal law); *id.* § 20(1) (change effective for tax years beginning on or after January 1, 1986). In this case, Oracle Corporation joined with affiliates incorporated in the United States in filing a federal consolidated income tax return for each of the Years at Issue, which generally means that the corporations' separate income and

losses were pooled, and intercompany dividends and other transactions among members of that group were largely eliminated. Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates & Gifts* ¶ 97.2.1 (Nov 2020) ("The basic principle of the consolidated return is that a consolidated group is taxed on its consolidated taxable income, representing principally the results of its dealings with the outside world after elimination of intercompany profit and loss."); *id.* ¶ 97.4.1 ("[I]ntercompany transactions are, with some exceptions to prevent tax avoidance, eliminated in computing the group's consolidated taxable income."). Those affiliates that were subject to Oregon tax also were required to join in filing Oregon consolidated returns, and the Oregon starting point became the federal "*consolidated*" taxable income of the group filing federal consolidated returns. *See* ORS 317.715(1). Under federal law, corporations formed under the laws of foreign countries and other non-United States jurisdictions generally are not subject to income tax unless they have United States-source income or income effectively connected with the conduct of business in the United States. *See generally* Bittker & Lokken, ¶¶ 65.3.1; 65.3.2; 67.1.1. As an extension of this principle, foreign corporations such as the CFCs in this case are excluded from a consolidated return. *See* IRC § 1504(a)(1) (defining "affiliated group" to mean "1 or more chains of includible corporations" that meet certain criteria); *id.* § 1504(b)(3) (excluding foreign corporations from the definition of "includible corporations"). This means that the CFCs' income and losses were not pooled with those of the consolidated group, and dividends from the CFCs were not eliminated but instead counted as gross income to the consolidated group. Therefore, Oregon's starting point (federal consolidated taxable income) did not include the CFCs' income or losses, but it did include dividends paid to the corporations that joined in the federal consolidated return.[4]

    The second step is to determine whether the federal consolidated group consists of more than one "unitary

---

[4] The Oregon legislature adopted the consolidated return approach as a way to voluntarily limit the extranational reach of the state's taxing power in response to pressure from Congress and foreign governments, while still pooling the income and loss of affiliated corporations in a manner similar to the prior "combined" reporting system. *See generally StanCorp*, 21 OTR at 125.

group"; if so, each separate unitary group doing business in Oregon may be required to file its own Oregon consolidated return. *See* ORS 317.715(2) (requiring separation of unitary groups); ORS 317.070 (imposing corporation excise tax on a corporation "doing business within this state"). The concept of a "unitary group" derives not from the Internal Revenue Code but from federal constitutional regulation of state taxation. As applied here, the term refers to a group of corporations engaged in a common business enterprise, operating in more than one state, that is sufficiently integrated (unitary) that any state where a member is taxable may fairly be permitted to tax a share of the value or income of the entire business enterprise, rather than taxing only the discrete items of value or income directly traceable to the state. *See Allied-Signal, Inc. v. Director, Div. of Taxation*, 504 US 768, 778-80, 112 S Ct 2251, 119 L Ed 2d 533 (1992). Oregon has codified a definition of "unitary business," based on an interpretation of constitutional case law, as a business enterprise in which there is a "sharing or exchange of value" as demonstrated by "centralized management or a common executive force"; "centralized administrative services or functions resulting in economies of scale"; or a "flow of goods, capital resources or services demonstrating functional integration." *See* ORS 317.705(2), (3).

Assuming that all of the affiliates in the federal consolidated group are engaged in the same "unitary business" (a point not at issue in these motions), the third step is to apply the various "additions," "subtractions," and other modifications to federal consolidated taxable income that Oregon law prescribes. *See* ORS 317.715(3)(a). The "dividends-received deduction" under ORS 317.267 is the modification that occurred in this case; taxpayer's motion relies on that statute. When a corporate taxpayer receives a dividend from an affiliate outside the consolidated return group, federal law generally allows the payee to claim a deduction for a specified portion of that dividend. *See generally* IRC § 243. Subsection (1) of ORS 317.267 generally requires the taxpayer to add that deducted amount back to federal taxable income. With the slate thus clean, subsection (2) allows the taxpayer to subtract 80 percent of the dividend, assuming that the taxpayer has at least a 20 percent ownership interest in the payor.

Assuming that the unitary business is taxable in more than one state, the fourth, fifth, and sixth steps determine Oregon's taxable share of post-modification income. This occurs pursuant to state "allocation" and "apportionment" laws and consistent with federal constitutional limitations. *See* ORS 317.010(10)(a)-(c); *see also Tektronix, Inc. v. Dept. of Rev.*, 354 Or 531, 536-38, 316 P3d 276 (2013), *aff'g on other grounds*, 20 OTR 468 (2012) (defining and describing allocation and apportionment under Oregon's version of the Uniform Division of Income for Tax Purposes Act (UDITPA), ORS 314.605 to 314.670). Step four is to subtract all non-apportionable "nonbusiness" income; step five is to multiply the remaining amount (apportionable "business" income) by the percentage determined by the Oregon apportionment formula; and step six is to add back any amounts of non-business income that must be "allocated" to Oregon under Oregon's version of UDITPA. The result of these six steps is Oregon "taxable income."

At issue in this case is the apportionment formula (step five above). For the Years at Issue, Oregon's UDITPA prescribed a standard single-factor formula based solely on the taxpayer's "sales" in Oregon compared to sales everywhere. *See* ORS 314.650 (all business income to be apportioned to Oregon "by multiplying the income by the sales factor"). The term "sales" is defined as "all gross receipts of the taxpayer not allocated" as nonbusiness income. ORS 314.610(7). The standard UDITPA formula may be contrasted with other formulas reserved for specific businesses, such as a "public utility," a "financial organization," an "insurer," or an "interstate broadcaster." *See* ORS 314.615 (excluding public utility or financial organization from UDITPA); ORS 314.280 (authorizing department to adopt apportionment formulas by rule for public utilities and financial organizations); ORS 317.660 (apportionment of insurer income); ORS 314.680-314.695 (interstate broadcasters). For any business subject to the standard UDITPA formula, the department may allow or require a tailored apportionment method (or separate accounting) if the UDITPA formula does not "fairly represent" the extent of the taxpayer's business activity in Oregon. ORS 314.670(1) (allowing alternative methods of assigning taxable income to Oregon). In this case, taxpayer's

returns applied UDITPA's standard formula. That formula is set forth in ORS 314.665(1), which states:

> "[T]he sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period."

The remainder of ORS 314.665 contains rules to determine whether a sale must be included in the numerator, along with special rules such as the exclusion from the definition of "gross receipts" under ORS 314.665(6)(a) that is the subject of the department's motion.

## V.   ANALYSIS

With this background in mind, the court returns to the parties' arguments.

A.   *Taxpayer's argument: Does ORS 317.267(3) require inclusion of unsubtracted amounts?*

Taxpayer relies on subsection (3) of ORS 317.267, which states:

> "There shall be excluded from the sales factor of any apportionment formula employed to attribute income to this state any amount subtracted from federal taxable income under subsection (2) of this section."

Taxpayer urges the court to determine that, because subsection (3) requires it to exclude the 80 percent of the Subpart F Income and Dividends that taxpayer subtracted, subsection (3) also necessarily requires taxpayer to include the unsubtracted 20 percent. Taxpayer describes its position as the "clear corollary" of ORS 317.267(3) and relies on the principle of statutory interpretation known as "*inclusio unius est exclusio alterius*" (the inclusion of the one is the exclusion of the other), and on ORS 174.020(2), which states that "a particular intent controls a general intent" when the two are inconsistent.

Under the analytical framework that the Oregon Supreme Court has prescribed for interpreting statutes, the court starts not with the maxims taxpayer cites, but with the text and context, as well as any helpful legislative history, before consulting maxims "if the legislature's

intent remains unclear." *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). The text of subsection (3) does not state that the unsubtracted portion of a dividend must be included in an apportionment formula. The text does not specify whether the unsubtracted portion must be included or excluded. This silence can mean one of three things: (a) the legislature intended to imply that the unsubtracted portion must be included; (b) the legislature intended to imply that the unsubtracted portion must, like the subtracted portion, be excluded (a position neither party advances here); or (c) the legislature did not intend subsection (3) to answer the question. The court proceeds to statutory context for any further insight.

Statutory context includes other laws in place at the time of enactment. *See Unger v. Rosenblum*, 362 Or 210, 221, 407 P3d 817 (2017) ("[W]e do not consider the meaning of a statute in a vacuum; rather, we consider all relevant statutes together, so that they may be interpreted as a coherent, workable whole.") (citing *Lane County v. LCDC*, 325 Or 569, 578, 942 P2d 278 (1997)); *Gaines*, 346 Or at 177 n 16 ("Ordinarily, only statutes enacted simultaneously with or before a statute at issue are pertinent context for interpreting that statute."). The legislature enacted subsection (3) of ORS 317.267 in 1985, as part of a large technical corrections bill making numerous changes to the 1984 corporation excise tax overhaul act referred to above. *See* Or Laws 1985, ch 802, § 33; *see also* Tape Recording, House Committee on Revenue and School Finance, Subcommittee on Income Tax, HB 2011, May 9, 1985, Tape 213, Side A (testimony of Elizabeth Stockdale) (testifying, as attorney-in-charge for tax section of Oregon Department of Justice, that bill was necessary to "eliminate * * * ambiguities" because 1984 bill "was drafted in kind of a hurry"). Then as now, the UDITPA formula in ORS 314.650 and ORS 314.665 was not the only apportionment formula allowed or required under Oregon law.[5] The department has identified two circumstances in 1985 in which dividends were entirely excluded from the apportionment formula. First, the formula for airlines, under ORS 314.280

---

[5] The court reads the reference to "any" apportionment formula in subsection (3) as a recognition that a variety of formulas exists.

and what is now OAR 150-314-0078, provided: "Passive income items such as interest, rental income, dividends, etc., will not be included in the denominator \*\*\*." *Former* OAR 150-314.280-(G)(3)(b)(D) (1983). Second, for any taxpayer, a rule under the "fairly represent" provision in ORS 314.670 provided:

> "Where business income from intangible property cannot readily be attributed to any particular income producing activity of the taxpayer, such income cannot be assigned to the numerator of the sales factor for any state and shall be excluded from the denominator of the sales factor. For example, where business income in the form of dividends received on stock, royalties received on patents or copyrights, or interest received on bonds, debentures or government securities results from the mere holding of the intangible personal property by the taxpayer, such dividends and interest shall be excluded from the denominator of the sales factor."

*Former* OAR 150-314.670-(C)(3) (1983).

Taxpayer's position, that inclusion of the unsubtracted portion of a dividend is the implied logical corollary of the express exclusion of the subtracted portion, would mean that the legislature also intended to include the unsubtracted portion in the formula in both of these circumstances. The court finds it unlikely that the legislature had that intention because the result would be that in both circumstances other "passive" receipts attributable to the "mere holding" of intangibles would remain fully excluded, while the unsubtracted portion of dividends would have to be included even if the airline or other taxpayer was a merely passive holder of the stock. Taxpayer offers no reason why the legislature would have wanted to single out passive interests in stock for treatment different from passive interests in other intangibles, and the court sees no reason to think that the legislature would have considered that treatment more fair or accurate than complete exclusion of the receipts. The court finds the department's explanation more logical: the legislature did not intend subsection (3) of ORS 317.267 to address the inclusion or exclusion of the unsubtracted portion of a dividend. Based on the statutory context, the court tentatively concludes that subsection (3)

leaves it to the substantive law governing the particular apportionment formula applicable to the taxpayer to determine inclusion or exclusion.

The court finds nothing in legislative history that changes this conclusion. The department has presented an analysis of the legislative history from both 1985 and 1984. Unsurprisingly, given the bulk of the bill, neither party has proffered legislative history that specifically addresses the addition of ORS 317.267(3).

This leaves taxpayer's arguments based on maxims of statutory construction. The principle that "*inclusio unius est exclusio alterius*" may be useful in the absence of other evidence of legislative intent, but it cannot overcome the strong indicators in the statutory context discussed above. As to the principle that the more specific intent controls, the court concludes that taxpayer erroneously assumes that the legislature has articulated in ORS 317.267(3) a specific intention to require inclusion of the unsubtracted dividend in the sales factor. The legislature did not do that, however; it was silent on that point. Taxpayer's argument assumes the conclusion that it seeks.

The court will deny taxpayer's motion.

B.  *Department's argument: Does ORS 314.665(6)(a) require exclusion of unsubtracted amounts?*

The court turns to the department's argument in its cross-motion that ORS 314.665(6)(a) requires taxpayer to exclude the unsubtracted amounts from the sales factor. That provision states:

"For purposes of this section, 'sales':

"(a)  Excludes gross receipts arising from the sale, exchange, redemption or holding of intangible assets, including but not limited to securities, unless those receipts are derived from the taxpayer's primary business activity."

ORS 314.665(6)(a). The department argues that this language excludes the unsubtracted 20 percent of the Subpart F Income and of the Dividends because those amounts arise from the holding of the CFC stock. The department argues further that the exception for receipts derived from the

taxpayer's primary business activity does not apply because taxpayer's primary business activity is selling software, not holding the CFC stock.

### 1. *Subpart F Income*

Before analyzing whether the exclusion in ORS 314.665(6)(a) applies, the court steps back to consider the general rule in ORS 314.665(1), reprinted above. That provision defines the sales factor as a fraction, of which the numerator is the taxpayer's "sales" in Oregon and the denominator is the taxpayer's "sales" everywhere. The term "sales" is defined as "all gross receipts of the taxpayer not allocated under ORS 314.615 to 314.645." ORS 314.610(7). The term "gross receipts" is not defined in UDITPA or elsewhere in chapter 314. Although the parties seem to have proceeded on the assumption that all amounts at issue are "gross receipts," and therefore "sales," the court feels compelled to test this assumption as applied to the Subpart F Income.

Although items that constitute income typically can be matched with the receipt of cash payments or property, in many circumstances that match is lacking or is subject to a significant time lag. Common examples of cash or property receipts that are not income include certain damages payments, insurance recoveries, condemnation proceeds if timely reinvested in property that is "similar or related in service or use," distributions from a corporation that constitute a return of capital rather than a dividend, or payments constituting recovery of the taxpayer's "basis" in property the taxpayer sells.[6] Examples of income not accompanied by

---

[6] *See* Bittker & Lokken, ¶ 13.1 (discussing the exclusion of damages payments from gross income); *id.* ¶ 12.1 (discussing the exclusion of life insurance, annuity, and endowment contracts, and employee death benefits from gross income); *id.* ¶ 44.3 (discussing nonrecognition of gain on the involuntary conversion of property, such as by condemnation, under IRC section 1033); *id.* ¶ 92.1 ("To the extent not covered by current or accumulated earnings and profits, a distribution is treated as a return of the shareholder's capital and applies in reduction of the adjusted basis of the stock[.]"); *id.* ¶ 41.1 ("On a sale of property, gain or loss is the difference between the amount realized and the taxpayer's adjusted basis for the property. This fundamental principle *** permits the taxpayer's investment to be recovered tax-free before the taxpayer is charged with gain on the sale[.]") (internal footnote omitted).

a receipt of cash or property include certain debt forgiveness amounts, items of income that the taxpayer accrues under its method of accounting before actually receiving them, income that the taxpayer has "constructively" received, and cash that the taxpayer diverts to another under the doctrine of "anticipatory assignment of income."[7]

Subpart F income is in the latter category. Congress enacted subpart F of the Internal Revenue Code in 1962 because the federal principle that limits the taxation of corporations formed under foreign law enables a domestic parent corporation to indefinitely defer tax on income earned by foreign subsidiaries by causing the foreign subsidiaries to not pay dividends. *See id.* ¶ 69.1 (quoting S Rep No 1881, 87th Cong, 2d Sess ("[N]o U.S. tax is imposed with respect to the foreign source earnings of these corporations . . . until dividends paid by the foreign corporations are received by their American parent corporations or their other American shareholders." (Ellipsis in original.)). Subpart F income is a collection of specific types of income of the CFC, each of which is separately computed according to rules designed to limit any incentive to shelter that type of income from US or foreign tax, or (in some cases) to punish overtly illegal behavior such as the payment of bribes or kickbacks. *See id.*; Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations & Shareholders* ¶ 15.62[1] (Nov 2020) (explaining computation of subpart F income). The CFC shareholder must include in federal gross income the sum of these items, capped by the CFC's earnings and profits for the year. *See* IRC §§ 951(a)(1), 952(c)(1)(A). When a CFC pays an actual dividend, the payment generally reduces the CFC's earnings and profits for the year; thus, to the extent the CFC pays actual dividends, the amount that the US shareholder must include as subpart F income is generally reduced as well. *See* Bittker & Eustice, ¶ 15.61[3].

---

[7] *See* Bittker & Lokken, ¶ 7.1 (discussing income from discharge of indebtedness); *id.* ¶ 5.9 (discussing the accrual method of accounting, under which the taxpayer "takes sales and other transactions into account when they occur, even though the taxpayer must wait for payment"; discussing constructive receipt of income, which is income "not actually reduced to a taxpayer's possession [but] is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time[.]"); *id.* ¶ 75.2 (discussing anticipatory assignments of income).

### a. Was taxpayer's Subpart F Income "gross receipts"?

The court analyzes the term "gross receipts" to determine whether the legislature intended the term to include subpart F income. The court first reviews contemporaneous general and legal dictionaries to identify the plain meaning and any "technical" meaning of the term when the Oregon legislature adopted it. *See Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295-96 & n 7, 337 P3d 768 (2014) (stressing the importance of consulting dictionary definitions contemporaneous with enactment of the statute); *EAN Holdings, LLC v. Dept. of Rev.*, 24 OTR 200, 203 (2020) (explaining that the court must determine whether words have a specialized or technical meaning "that differs from the plain meaning" and "determine whether the legislature intended to use the term in that different, technical sense") (citing *State v. McNally*, 361 Or 314, 321-22, 392 P3d 721 (2017); *DCBS v. Muliro*, 359 Or 736, 745-56, 380 P3d 270 (2016)). The definition of "sales," including the reference to "gross receipts," has not changed since the Oregon legislature adopted UDITPA in 1965. *See* Or Laws 1965, ch 152, § 2. At that time, neither *Webster's Third New International Dictionary* nor *Black's Law Dictionary* included a definition of "gross receipts." The relevant definitions of "receipt" in *Webster's* were:

"3:   the act or process of receiving <in [receipt] of a salary which he had earned –O. S. J. Gogarty> <ports equipped for the [receipt] of large vessels –L. D. Stamp>[;]

"4:   something (as food, goods, money) that is received — usu[ally] used in pl[ural] <ranks about tenth in the United States in volume of fresh fruit and vegetable [receipt]s –Calif. Agric. Bull.> <improve the harbor to accommodate larger raw material [receipt]s –Steel Facts> <took the day's [receipt]s to the bank's night depository –J. C. Furnas>[;]

"5:   a writing acknowledging the taking or receiving of goods or money delivered or paid <could offer only poor paper money or [receipt]s to pay for it –F. V. W. Mason> <paid the bill in cash and was given a [receipt]>[.]"

*Webster's Third New Int'l Dictionary* 1894 (unabridged ed 1961) (emphasis omitted). The primary definition of "receive" was "to take possession or delivery of." *Id.*

Similarly, *Black's Law Dictionary* did not define "gross receipts" but defined "receipt" in pertinent part as the "[a]ct of receiving; also, the fact of receiving or being received; that which is received; that which comes in, in distinction from what is expended, paid out, sent away, and the like." *Black's Law Dictionary* 1433 (4th ed 1951). And the definition of "receive" in *Black's* was "[t]o take into possession and control; accept custody of." *Id.*

The court concludes that the plain meaning of "receive" and its derivative "receipt" referred to the act of taking something into possession. Those terms had an established legal meaning that was indistinguishable except perhaps in its emphasis on physical possession. The court proceeds to review relevant statutory context.

The court starts with the remaining provisions of UDITPA, because the 1965 legislature adopted UDITPA as a complete bill, making very few changes to the uniform language that had been the work of a national committee for nearly a decade. *See Powerex Corp. v. Dept. of Rev.*, 24 OTR 146, 172-76 (2020) (discussing Oregon-specific changes upon adoption of UDITPA). Because the process of drafting UDITPA played out in public over a number of years and was the subject of contemporaneous commentary, the court refers to deliberations and published reports on that process as additional relevant "context" for the bill as presented to the Oregon legislature for approval. *Cf. Powerex Corp. v. Dept. of Rev.*, 357 Or 40, 346 P3d 476 (2015) (citing UDITPA commentary); *Twentieth Century-Fox Film Corp. v. Dept. of Rev.*, 299 Or 220, 700 P2d 1035 (1985) (same).

The text of UDITPA includes an express statement of purpose: "to make uniform the law of those states which enact it." Or Laws 1965, ch 152, § 20. The court notes, however, that the object of this effort is not a uniform definition of "income," but only a uniform method of attributing an appropriate portion of a multistate taxpayer's overall net income to each state; UDITPA nowhere attempts to define

"income."[8] UDITPA also contains an *implied* statement of purpose: to "fairly represent the extent of the taxpayer's business activity in this state[.]" *Id.* § 19 (allowing department to permit or require separate accounting or alternative, "equitable," apportionment if standard UDITPA formula does not fairly represent extent of taxpayer's business activity in the state); *see Fisher Broadcasting, Inc. v. Dept. of Rev.*, 321 Or 341, 355, 898 P2d 1333 (1995) (finding UDITPA's apportionment method that fairly represents in-state "business activity" "materially different" from goal of fairly and accurately reflecting taxpayer's in-state "net income" under ORS 314.280). These statements of purpose suggest that the drafters thought of *income* as something different from the factors used to *attribute* income to a particular state.

Notwithstanding this general distinction between income and the factors involved in apportioning it, the definition of "sales" reveals some conflation of the terms "gross receipts" and "income": "'Sales' means all gross receipts of the taxpayer not allocated under ORS 314.615 to 314.645." ORS 314.610(7). Yet the cited provisions do not purport to allocate "gross receipts" but rather nonbusiness "income," including net rents and royalties, capital gains from sales of real property, and interest and dividends. *See* ORS 314.630 - 314.640. This usage, standing alone, weighs in favor of treating subpart F income as gross receipts even though the United States shareholder of a CFC does not take "possession" of any cash associated with the subpart F income.

---

[8] In fact, section 4 of UDITPA recognizes that states at that time (as now) imposed a variety of different taxes, including taxes measured by "net income" and taxes imposed on other kinds of tax bases. Or Laws 1965, ch 152, § 4 (taxpayer considered "taxable" in another state if the other state has "jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not"); *see also* Minutes, Proceedings in Committee of the Whole Uniform Division of Income for Tax Purposes Act at 2, July 9, 1957 (statement of George V. Powell), *available at* https://www.uniformlaws.org/viewdocument/committee-archive-93?CommunityKey=f2ef73d2-2e5b-488e-a525-51be29fbee47&tab=librarydocuments (Act is "designed for adoption only in those states which have taxes upon net income or which are in some fashion measured by net income. *** It does not amend the income tax law. All it does is apportion the tax among the states."); William J. Pierce, *The Uniform Division of Income for State Tax Purposes*, 35 *Taxes—The Tax Magazine* 747 (Oct 1957) ("[T]he uniform act assumes that the existing state legislation *has defined the base of the tax* *** [and] does not deal with the problem of ascertaining the items used in computing income or the allowable items of expense." (Emphasis in original.)).

For further context, the court reviews the remaining components of the apportionment formula as adopted in 1965: the "property" factor and the "payroll" factor. The 1965 act assigned equal weight to each of the three factors, and that equal weighting remained in place until 1989.[9] The property factor consisted of the average value of the taxpayer's "real and tangible personal property" in Oregon divided by the value of its real and tangible personal property everywhere, with owned property valued at its "original cost" and property rented from others valued at eight times the net annual rental rate. *See* Or Laws 1965, ch 152, §§ 11-12. The average values were redetermined at least annually. *See id.* § 13.

The court finds two features of the property factor significant. First, only tangible personal property and real property were included, although the UDITPA drafters knew about intangible property and the Oregon legislature's experience with centrally assessed property certainly made it aware that intangible property could be a substantial component of the value of a multistate business. *See* ORS 308.510(1) (1965) ("property" used in a centrally assessed business included "all property, real and personal, tangible and intangible"); *e.g.*, *Knappton Towboat Co. v. Chambers*, 202 Or 618, 627, 276 P2d 425 (1954) (describing method to determine value of the unit's intangible assets). For apportionment purposes, identifying a physical location for the property was key. Second, because the value of each item of owned property was frozen at the acquisition price, and the total value of the taxpayer's property was redetermined periodically, the property factor essentially was an annual snapshot of the taxpayer's historical outlay of funds to acquire real and personal property in the state, compared

---

[9]  In 1989, the legislature assigned additional weight to the sales factor, commencing a trend that, as of the Years at Issue, has eliminated all weight for the property and payroll factors for most taxpayers. *Compare* Or Laws 1965, ch 152, § 10 (apportioning business income "by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three"), *with* Or Laws 1989, ch 1088, § 1 (amending subsection (1) to state that the numerator of the sales factor "is the property factor plus the payroll factor plus **two times** the sales factor, and the denominator of which is [*three*] **four**.") (emphasis and brackets in original to flag added (boldface) and removed (bracketed) language) *and* ORS 314.650 (business income is multiplied "by the sales factor").

to such expenditures everywhere. Consistent with the statutory focus on "the extent of the taxpayer's business activity" in the state, the valuation feature thus depended on the taxpayer's actual expenditures and ignored the possibility of market-based appreciation or depreciation, or depreciation due to obsolescence.[10]

The payroll factor consisted of the "total amount paid in this state during the tax period for compensation" divided by the total compensation paid everywhere. Or Laws 1965, ch 152, § 14.[11] "Compensation" was limited to "wages" and other amounts "paid" to employees as remuneration. *See id.* § 2(3). To determine where compensation was "paid," the act looked first to where the employee performed the services, and if the employee performed services in more than one state, the act then looked to the location of the base of operations or the place from which the service was directed or controlled. *Id.* § 15. The payroll factor made no attempt to determine where the benefit of the employee's services might be received or enjoyed; wages paid to an architectural draftsperson working in Oregon were sourced to Oregon even if the building was in Washington. *Cf.* OAR

---

[10] The 1957 minutes suggest that cost, rather than value, also was selected because that amount was readily determinable and could be measured uniformly without regard to states' varying rates of calculating depreciation for income tax purposes. Minutes, Proceedings in Committee of the Whole Uniform Division of Income for Tax Purposes Act at 18, July 9, 1957 (statement of George V. Powell), *available at* https://www.uniformlaws.org/viewdocument/committee-archive-93?CommunityKey=f2ef73d2-2e5b-488e-a525-51be29fbee47&tab=librarydocuments; *see also* Charles F. Conlon, *The Apportionment of Multistate Business Income—the NCCUSL Uniform Division of Income Act*, 12 *Tax Executive* 220 (1960).

[11] The UDITPA drafters adopted the provisions for determining the sourcing of compensation nearly verbatim from the Model Unemployment Compensation Tax Act in order to facilitate taxpayer compliance. *See* Minutes, Proceedings in Committee of the Whole Uniform Division of Income for Tax Purposes Act at 19-20, July 9, 1957 (statement of George V. Powell), *available at* https://www.uniformlaws.org/viewdocument/committee-archive-93?CommunityKey=f2ef73d2-2e5b-488e-a525-51be29fbee47&tab=librarydocuments (reading the compensation sourcing rules under UDITPA and then stating, "I would like to point out that this is the exact language of the Model Unemployment Compensation Act which is in force in all of the states."); *see also id.* at 21 (statement of Pierce) ("The reason we took this language verbatim is this: Every corporation will have already computed all the figures for the payment of their unemployment tax to the several states in which they do business, so that for computing this factor they just take everything that they have already reported to the individual states for paying the unemployment tax and put it here.").

150-314-0435(4)(b)(B) (2018) (under market-based sourcing rules, assigning receipts to location of customer or customer's property in various circumstances). In all aspects, the payroll factor focused on the physical location of the individual worker or of the persons controlling the worker's actions, again reflecting physical business activity in the state.

This review of the property and payroll apportionment factors weighs against treating "gross receipts" as identical to "income." The property and payroll factors used concrete, readily determined metrics of cash expenditures tied to physical locations, as opposed to more legally nuanced concepts such as the fair market value of property or the location where a customer receives the benefit of services. This context suggests that "gross receipts" was more likely to refer to cash or property of which the taxpayer took possession, rather than amounts that became income solely by imputation as a matter of law.

An Oregon Supreme Court decision, and subsequent Oregon legislation, supply important context to understand how the 1965 legislature would have viewed the relationship between "gross receipts" and "income." In *Corbett Inves't Co. v. State Tax Com.* The taxpayer was an investment company that derived income from rental properties but, in the year at issue (1944), sold some property at a loss of $115,718.14. 181 Or 244, 245, 181 P2d 130 (1947). The taxpayer sought exemption from the corporation excise tax based on a provision that exempted "[e]very corporation whose *gross receipts* to the extent of at least ninety-five (95) percent thereof is derived from rentals of real property owned by it ***." *Id.* at 245-46 (quoting OCLA § 110-1511(k)) (emphasis added; ellipsis in original). Although the taxpayer incurred a loss on the sale, the cash it received from the sale apparently caused its receipts from rent to drop below 95 percent of its overall receipts for the year, a fact that prompted the attorney for the State Tax Commission to acknowledge that the taxpayer's claim for exemption had "an appealing equity." *Id.* at 245, 250. Nevertheless, the commission argued that "gross receipts" had a broad meaning that included the sale proceeds, ignored the loss, and rendered the taxpayer ineligible for the exemption. *Id.* at 247.

Seeking an established definition of "gross receipts," the court considered a wide range of terms occurring in case law and treatises, including "gross income," "gross proceeds," and "gross earnings." *Id.* at 249. The court found conflicting views as to whether or how to distinguish the terms, ultimately concluding that "[g]ross income or gross receipts are terms whose meaning depends largely upon the context and subject matter of the act in which they are used." *Id.* at 248-49 (citing *First Trust Co. of St. Paul v. Commonwealth Co.*, 98 F2d 27 (8th Cir 1938)).

Upon reviewing the statutory history of the Oregon real estate rental company exemption, the court found that, as originally enacted as part of the corporation excise tax act in 1929, the exemption provision contained the identical language, except that it used the term "gross income." Or Laws 1929, ch 427, § 11(j). The 1929 act defined "gross income" to include "gains, profits or income from dealings in real or personal property." Or Laws 1929, ch 427, § 2(g). The court concluded that under the original 1929 text the exemption would have applied to the taxpayer because the taxpayer incurred no "gain" or "profit" from the sale, only a loss. *See Corbett*, 181 Or at 247 ("Prior to this amendment, it is clear that * * * the plaintiff * * * would have been entitled to exemption, because a loss could in no sense be considered as a part of income."); *id.* at 249 ("'income' implies a gain or profit"). The court also stated: "The United States Supreme Court has definitely rejected the broad contention that all receipts—'everything that comes in'—are income within the meaning of 'gross income' as used in tax legislation." *Id.* at 248 (citing *Southern Pacific Co. v. Lowe*, 247 US 330, 38 S Ct 540, 62 L Ed 1142 (1918)).[12]

---

[12] In *Southern Pacific*, the Court eliminated earnings and profits accumulated before the effective date of the Federal Income Tax Act of 1913 and the adoption of the Sixteenth Amendment to the Constitution of the United States as the measure of taxable dividends paid after the effective date of the act. 247 US at 335-37. The court held that "the accumulations that accrued to a corporation prior to January 1, 1913, [were] capital, not income, for purposes of the act." *Id.* at 335. The Court also found it important that the dividend-payor was the wholly owned subsidiary of the taxpayer and therefore the two entities "were in substance identical because of the complete ownership and control which the latter possessed over the former, as stockholder and in other capacities." *Id.* at 337.

The court explained that the legislature in 1933 amended the exemption statute to replace "gross income" with "gross receipts." *Corbett*, 181 Or at 247; *see* Or Laws 1933, ch 33, § 4 (Spec Sess). However, the court stated that the intent of the original 1929 act was "to relieve the heavy burden of taxes imposed upon real property. It was provided therein that corporations whose income consisted principally of rentals of real property should be exempted in order to avoid double taxation." *Corbett*, 181 Or at 246. The court considered what intention the 1933 legislature might have had in substituting the term "gross receipts" for "gross income," but the court concluded that assigning the broadest meaning to the term "gross receipts" would yield an "absurd, unreasonable and unjust result \*\*\*." *Id.* at 248. The court hypothesized that the legislature could not have intended, for example, to disqualify from the exemption a corporation that happened to receive proceeds from the involuntary conversion of property as a result of eminent domain proceedings, or proceeds from insurance after property was destroyed by fire. *Id.* Accordingly, the court declined to give a "strict or literal construction" to the term "gross receipts" and held that, "consonant with the purpose and spirit of the excise tax law," the term "gross receipts" includes only "receipts within the classification of 'income.'" *Id.* at 249-50.

Six years after *Corbett*, in 1953, the legislature inserted a special definition of "gross receipts" into the real estate rental company exemption statute. As amended, the definition conformed to, and tightly circumscribed, the court's opinion in *Corbett*:

> "For the purposes of this subsection, 'gross receipts' shall mean the gross amount of all receipts, any part of which is included within the term 'gross income' as defined in section 110-1506, subsection (3), O.C.L.A., undiminished by any deductions, exemptions or exclusions whatsoever; but, in the case of a sale, exchange or involuntary conversion of property not held for sale in the ordinary course of the trade or business, only the amount of gain, computed in accordance with section 110-1512, O.C.L.A., as amended, and recognized under the provisions of section 110-1513, O.C.L.A., as amended, shall constitute gross receipts."

Or Laws 1953, ch 653, § 1, amending OCLA § 110-1511, as amended by Or Laws 1949, ch 406, § 1. The legislature eliminated the exemption altogether in 1955. Or Laws 1955, ch 592, § 5.

Based on *Corbett*, the legislature in 1965 would have understood that the "literal" meaning of "gross receipts" encompassed cash proceeds as distinct from "income," even though the court found an overriding legislative intention to equate the two terms for purposes of the exemption at issue in that case. The legislature in 1965 also would have been aware of its own action in 1953 to create a specific definition of "gross receipts"—solely for the purpose of applying the real estate rental company exemption—that deviated from the general definition and conformed to the exception created in *Corbett*. The court finds that this context weighs heavily in favor of interpreting "gross receipts," as used in the definition of "sales" for apportionment purposes, as a concept different from "income." Whereas "income" bore legal interpretations that substituted gain for the total amount received from a sale, and ignored altogether any amount received as eminent domain compensation or an insurance recovery, the 1965 legislature would have understood "gross receipts" to mean "everything that comes in." The court finds this meaning of "gross receipts" also consistent with the focus on "taking possession" in the dictionary definitions and the focus on actual cash expenditures in the property and payroll factors.

The court has found nothing relevant to this issue in the written materials comprising the legislative history of Oregon's adoption of UDITPA, nor in the available recordings of oral proceedings.

> b.   Conclusion: ORS 314.665(6)(a) does not apply to taxpayer's Subpart F Income

Based on the text, context, and legislative history, the court concludes that "gross receipts," and therefore "sales" for purposes of Oregon's sales factor under UDITPA, does not encompass subpart F income. This means that it misses the mark to focus on whether the 1995 legislature intended the exclusion in ORS 314.665(6)(a) for "gross receipts arising from the sale, exchange, redemption or

holding of intangible assets" to apply to taxpayer's Subpart F Income. ORS 314.665(6)(a) cannot apply because taxpayer's Subpart F Income was never gross receipts in the first place. Rather, the Subpart F Income is simply additional income; the record to date does not indicate that taxpayer's Subpart F Income was matched to any item of actual gross receipts that were accounted for in the apportionment factor. The department's motion poses only the narrow question whether ORS 314.665(6)(a) requires the unsubtracted portion of taxpayer's Subpart F Income and Dividends to be excluded from the apportionment factor, assuming it is apportionable business income. Having concluded that the answer is "no," the court will deny the department's motion as to taxpayer's Subpart F Income.[13]

### 2. *Dividends*

The court now turns to the Dividends. Here, there is no lack of a match; the Dividends were actual distributions of gross receipts that also constituted income to taxpayer.[14] The question is whether the Dividends "ar[ose] from the sale, exchange, redemption or holding of intangible assets," and if so, whether the Dividends were "derived from the taxpayer's primary business activity." *See* ORS 314.665(6)(a). The court

---

[13] The court notes that it finds nothing inconsistent in treating the Subpart F Income as not "gross receipts" for apportionment purposes while treating it as "deemed" dividends for purposes of the subtraction under ORS 317.267, as both parties have done in this case. Federal income tax commentators regularly refer to subpart F income as "deemed" dividends, and the Oregon legislature included the reference to "dividends *** received or deemed received" in ORS 317.267(2) in 1984, some 20 years after Congress had adopted subpart F of the Code. *See* Or Laws 1984, ch 1, § 9(2) (Spec Sess); Revenue Act of 1962, Pub L No 87-834, 76 Stat 1006 (codified as amended at 26 USC §§ 901 *et seq.*); Postlewaite, Cameron & Kittle-Kamp, ¶ 14.08[2] ("The sum of these [subpart F] income categories is imputed to the CFC's United States shareholders as a deemed dividend to the extent of the CFC's earnings and profits. This deemed dividend is subject to tax at ordinary income rates, even though such income has not been received by the shareholders.").

[14] As the department points out in arguing against taxpayer's position on the meaning of ORS 317.267(3), the express exclusion from the apportionment formula of the *subtracted* portion of an actual dividend helps to preserve the integrity of this match: the taxpayer gets the benefit of the subtraction from income, but an out-of-state taxpayer may not "double dip" by still counting the subtracted portion as gross receipts in the sales factor denominator, thereby diluting its Oregon sales factor. Likewise, an in-state taxpayer that benefits from the subtraction is not "punished" by having to count the subtracted portion in the numerator (as well as the denominator) of its sales factor.

again applies the *State v. Gaines* framework. The court sees no issue regarding the "sale," "exchange," or "redemption" of assets; if the statute applies, it is because the Dividends "ar[ose] from" taxpayer's "holding" of the intangible assets in question, namely, the shares of stock in the CFCs that paid the Dividends.[15]

>    a.   Did the Dividends arise from taxpayer's "holding" of the CFC stock?

The court now examines whether the Dividends arose from taxpayer's "holding" of the intangible shares of CFC stock.[16] In *Webster's*, the first listed definition of the verb "hold" was synonymous with "possess": "to retain in one's keeping : maintain possession of : not give up or relinquish." *Webster's* at 1078 (unabridged ed 1993). The many additional listed meanings generally referred to various kinds of control or power over an object, for example, "to impose restraint upon or limit in motion or action," "to have or keep in the grasp," and "to receive and retain." *Id*. Similarly, the first definition in *Black's* was "[t]o possess in virtue of a lawful title; as in the expression, common in grants, 'to have and to hold,' or in that applied to notes, 'the owner and holder.'" *Black's* at 730 (6th ed 1990). From these definitions, the court concludes that the plain and technical legal meaning of "arising from" the "holding" of intangible assets was that the gross receipts at issue must originate from the possession or legal ownership of the shares.[17]

---

[15] Taxpayer argues that the legislature's reference to "securities" indicates an intention to limit the object of the exclusion to only those intangible assets that fit within the definition of a security. *See* ORS 314.665(6)(a) (excluding gross receipts arising from sale, exchange, redemption, or holding of intangible assets, "including but not limited to securities" unless receipts are derived from taxpayer's primary business activity). Consistent with *Tektronix*, the court rejects this argument. *Tektronix*, 354 Or at 544 ("The additional phrase that follows the term 'intangible assets'—'including but not limited to securities'—does not limit the meaning of the term.").

[16] As of 1995, the plain meaning of "arise" was "to originate from a specified source," to "come into being," to "come about," or to "become apparent in such a way as to demand attention." *Webster's* at 117 (unabridged ed 1993). The term also had an established legal meaning, but that meaning was indistinguishable: "To spring up, originate, to come into being or notice ***." *Black's* at 108 (6th ed 1990). The court sees no need to discuss this term further.

[17] The court also checked for a tax-law specific definition of "hold" or "holding," but the only definition found was not relevant for this discussion. *See West's*

The court turns to statutory context. Because ORS 314.665(6)(a) is part of Oregon's statutory mechanism to determine Oregon's taxable share of the income of a multistate enterprise, the court considers how that mechanism addressed dividends as of 1995. Under the constitutional principles to which Oregon's statutes sought to conform, it was clear at that time that dividends might be either non-apportionable nonbusiness income, or apportionable business income. The United States Supreme Court had determined that dividends were apportionable in either of two circumstances: (1) where the payor subsidiary was in the same unitary business as the payee, as described in *Mobil Oil Corp. v. Commissioner*, 445 US 425, 439-43, 100 S Ct 1223, 63 L Ed 2d 510 (1980); or (2) where the payor and payee were not in the same unitary business, but the payee used the payor's stock in an "operational function" in the payee's business, as opposed to holding the stock for an "investment function,"[18] as described in *Allied-Signal*, 504 US at 787-88. One well-recognized example of an "operational function" was the generation of income that formed "part of the working capital of the [payee] corporation's unitary business[.]" *Id.* at 787 (interest earned on short-term deposits in a bank is apportionable if the account is part of the company's working capital).

In this case, taxpayer's Oregon returns reported the Dividends as apportionable business income.[19] The department agrees that the Dividends are apportionable business income, but argues that the gross receipts constituting the Dividends are excluded from the apportionment factor under ORS 314.665(6)(a). Evidence in the record to date suggests that taxpayer as payee may be engaged in the

---

*Tax Law Dictionary* 412 (1995) (defining "holding" as the "conclusion of law reached by a court as to the legal effect of a case.").

[18] If the payor and the payee were not engaged in the same unitary business, and the stock served only an "investment function," the dividends were not apportionable at all, but were required to be allocated to a specific state. *See* ORS 314.625 and ORS 314.640 (dividends constituting nonapportionable, nonbusiness income must be allocated to state of payee's commercial domicile).

[19] In this appeal, taxpayer asserts an alternative claim that the Subpart F Income and the Dividends were nonbusiness income allocable to taxpayer's commercial domicile. That alternative claim is not at issue in these cross-motions, and the court expresses no view on that issue.

same unitary business as the CFC payors (circumstance (1) above).[20] If that proves accurate, then at least for due process purposes the form of the income as dividends becomes largely irrelevant: "So long as dividends from subsidiaries and affiliates reflect profits derived from a functionally integrated enterprise, those dividends are income to the parent earned in a unitary business." *Mobil Oil*, 445 US at 440; *see also* Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* ¶ 9.15[2] (Sept 2019) ("The rationale for holding intangible income apportionable when the payor and payee are engaged in a unitary business is that such income is, in substance, the operating income of the unitary enterprise even though it takes the form of intangible income paid by the subsidiary to its parent." (Internal footnote omitted.)).

Against this constitutional backdrop distinguishing among dividends from a unitary payee, dividends from stock serving an operational function such as cash management, and dividends serving an investment function, the

---

[20] Although taxpayer submitted scant evidence or argument addressing the CFCs' integration, or not, with taxpayer's unitary business, the department submitted as evidence taxpayer's Form 10K for the fiscal year ended May 31, 2012 (the "2012 10K"). The 2012 10K purports to describe the activities of the entire group of corporations consolidated under Generally Accepted Accounting Principles (GAAP). GAAP at that time—unlike the federal consolidated income tax rules—appears to have generally required controlled foreign corporations to be included in consolidated financial reports. *See* Paul E. Holt, *A case against the consolidation of foreign subsidiaries' and a United States parent's financial statements*, *Accounting Forum* (Oct 20, 2003), *available at* https://www.tandfonline.com/doi/full/10.1016/j.accfor.2003.10.001 ("[A]ccording to generally accepted accounting principles (GAAP) in the United States, [multinational corporations] which own more than 50% of the voting stock of foreign corporations are required to prepare consolidated financial statements" unless "control is temporary" or "control does not exist."); *see also* Steven M. Bragg, *GAAP 2012 Interpretation and Application of Generally Accepted Accounting Principles* 589-94 (2011) (stating that business entities that possess a controlling financial interest in one or more subsidiaries must, under GAAP, file consolidated financial statements that show "*all* of its subsidiaries presented as a single economic entity," and not discussing any general exceptions that allow parent entities to exclude foreign subsidiaries from consolidated financial returns on the basis that the subsidiary is a foreign entity (emphasis added)). Most of the narrative of the 2012 10K is phrased in the first-person plural ("we," "our"), and it generally does not distinguish between activities of domestic US or foreign affiliates. However, the few descriptions that do so tend to confirm that the activities of foreign subsidiaries are included. The department also submitted an April 2000 offering memorandum by Oracle Corporation Japan describing that company's "business, results of operation and financial position" as "dependent on the policies, business, results of operation and financial position of Oracle and on the performance, acceptance and competitiveness of Oracle products in the United States and internationally."

legislature enacted ORS 314.665(6)(a) in 1995 as a stand-alone bill. *See* Or Laws 1995, ch 176, § 1. There is no other text within the same bill to shed light on the meaning of the terms at issue here. The court has found no references within the income tax chapters of the ORS at the time that deviate from the plain and technical meaning of "holding" intangible assets as having to do with their possession.[21]

The court proceeds to the legislative history of the 1995 law, which the Oregon Supreme Court reviewed in *Tektronix*. 354 Or at 544-45. In that case, the taxpayer had sold all the assets of its printer division, including intangibles that it referred to as goodwill, and the taxpayer sought to exclude from the sales factor the gross receipts attributable to the goodwill. *Id.* at 533-34. This court concluded that the legislative history indicated an intent to limit the term "intangible assets" as used in ORS 314.665(6)(a) solely to "liquid assets" that taxpayers bought, held for short periods, and sold as a way to manage cash flow, creating a high volume of gross receipts that tended to skew the apportionment of income to the headquarters state. 20 OTR at 494-501. Accordingly, this court held that ORS 314.665(6)(a) provided no basis to exclude the taxpayer's obviously illiquid goodwill from the sales factor. *Id.* at 495. Although the Supreme Court agreed that the legislative history indicated an intent to address the so-called "treasury function" problem, the plain meaning of "intangible assets" encompassed a much broader class of assets. 354 Or at 545. Nothing in the legislative history showed any intent to limit the plain meaning of "intangible assets." *Id.* Therefore, the Supreme Court rejected this court's conclusion and held that the taxpayer's

---

[21] *See, e.g.*, ORS 314.260 (1995) (income of a real estate mortgage investment conduit or REMIC taxable "to the holders of the interests in the REMIC"); ORS 314.421 (1995) (income tax lien not valid as against any purchaser or "holder" of a security interest, etc., until warrant recorded); ORS 314.718(3) (1995) (partnership's holding period of property contributed by a partner includes period during which the property was "held" by that partner); ORS 316.683(4) (disallowing certain losses on sale or exchange of share "held by the taxpayer" for six months or less). One use of the term "holding" suggests that the legislature distinguished between possession of property and the other activities of managing, buying or selling the property. ORS 316.871(3)(d) (for purposes of deferral program for reinvestment of gain on sale of "small business corporation" securities, defining "small business corporation" as, among other things, "not engaged primarily in the business of managing, holding, buying or selling real property").

goodwill was an "intangible asset" that was required to be excluded from the sales factor.

In this case, there is no dispute that the CFC stock constitutes "intangible assets" under ORS 314.665(6)(a). The focus here is on taxpayer's activity with respect to those assets, specifically what the legislature meant by the "holding" of intangible assets.[22] In his overview introducing the bill to members of the House Revenue Committee, Steve Bender of the Legislative Fiscal Office described the provision that became ORS 314.665(6)(a) as follows:

> "What that means is if a business, for example, has a cash account and they *** maintain securities that earn interest and they sell those and buy new ones in an investment process, where that really isn't their business, the question is, well, every time they sell those securities is that included in the sales factor or not. This would exclude those types of sales."

Tape recording, House Committee on State and School Finance, HB 2203, Apr 25, 1995, Tape 86 Sides A & B at 03:17 (testimony of Steve Bender). Jim Manary, a representative for the department, testified:

> "[I]f you have a manufacturing business that then has some other assets—has an investment pool—where they turn over stocks and other intangibles and earn money on it, *** that technically is a sale, a sale of stocks, you want to count that kind of sale in with manufacturing sales, 'cause the sale will be attributed to wherever that investment is. It could be in New York that they're doing the investment.
>
> "*****
>
> "None of the states currently will include all that kind of a turnover of intangibles in the sales factor because it distorts where the regular business's income is, and the states are split. *** Part of them do not include it, as you can see from this, 17 of the states include the gain from that. So, if you are turning over intangible stock and you have gain from that, they will include that as a sale."

*Id.* at 7:00 (testimony of Jim Manary).

---

[22] In *Tektronix* the nature of the taxpayer's activity under ORS 314.665 (6)(a) was clear: The gross receipts arose from the "sale" of intangible assets. The taxpayer sold its printer division, including the goodwill, to another corporation (Xerox Corporation). *See* 20 OTR at 470.

Before the Senate Revenue Committee, Steve Bender testified:

> "What this is dealing with is, is a situation where you don't have a financial company, \*\*\* and they may hold a set of financial assets. And they might sell these assets to purchase new ones, and they may be short-term investments or what have you. And they're churning these assets and selling them and buying new ones, and just using that as a cash management mechanism. The question is, well, when they sell these assets, should that be included in the apportionment formula or not. This bill would exclude those."

Tape recording, Senate Committee on Government Finance and Tax Policy, HB 2203, May 5, 1995, Tape 113 Sides A & B at 0:50 (testimony of Steve Bender). Jim Manary then testified:

> "If in fact you do have a manufacturing operation, and you're trying to apportion the income among the states, do you want to now also include investment income as a way of doing that. We've had—there are some large corporations that might, on their primary business have $10 billion in sales a year, and they've got $100 billion in turnover in their investment portfolio. So you can distort, and that's—I didn't use the right numbers but that is an actual example to give you an idea—because they will go into the securities market each day and they might \*\*\* buy $10 or $20 million of stock and sell it that night. So they can turn over a lot, and the problem is distorting where that income really ought to be apportioned."

*Id.* at 07:05 (testimony of Jim Manary).

From this legislative history, especially the references to "turnover" and "churning," the court concludes that the legislature was focused on a passive "holding" of intangibles as "investments" for short periods (often less than a day) in anticipation of appreciation in value, or for the generation of interest or dividends, and then for sale. The examples discussed before the revenue committees involved securities the taxpayer held as part of an investment "pool" or "portfolio," further implying that the taxpayer did not control the issuers or manage the issuers' business.

Given the constitutional context and this legislative history, the court is concerned that describing taxpayer's dividends from the CFCs as arising from the "holding" of the

CFC stock may be a seriously misleading understatement. To be sure, the immediate origin of the dividends in taxpayer's hands was taxpayer's ownership and possession of the shares when the CFCs paid dividends, but taxpayer's relationship with the CFCs went far beyond that of passively "holding" shares pooled in an investment portfolio with the securities of other issuers, and cashing periodic interest and dividend checks before selling off the shares. The record as developed to date indicates that taxpayer owned 100 percent of the stock of most of the CFCs and, as described above, may have been engaged in the same unitary business with some or all of them. If the facts do show that the CFCs are engaged with taxpayer in a single, unitary business, then by definition this would mean that taxpayer's operations were thoroughly integrated with those of the CFCs, based on some combination of centralized management, centralized administrative services, and a flow of goods, capital resources, or services. *See Allied-Signal*, 504 US at 781-82; *see also* ORS 317.705(3) (defining "unitary business"). Taxpayer, as sole shareholder and perhaps also as a principal supplier or customer, may have been in a position to determine whether and when a CFC should pay it a dividend. There is strong evidence that taxpayer formed at least one of the CFCs (Oracle Japan), and as sole or majority shareholder, taxpayer may well have been empowered under local law to merge a CFC out of existence or dissolve it. In contrast to *Tektronix*, where the action generating the receipts was no more and no less than the "sale" of the intangible assets to a third party (Xerox) at arm's length, in this case the court declines to decide on summary judgment that the Dividends arose from taxpayer's "holding" of the CFC shares, where uncontroverted evidence indicates that taxpayer may have influenced or controlled the CFCs' business, including their formation and continued existence.

The court will deny the department's cross-motion as to whether the Dividends arose from the "holding" of the CFC stock.

b.    Were the Dividends derived from taxpayer's primary business activity?

Even if the Dividends can fairly be said to have arisen from taxpayer's holding of the CFC shares, the

Dividends still could not be excluded from the apportionment factor under ORS 314.665(6)(a) if the Dividends were "derived from the taxpayer's primary business activity." ORS 314.665(6)(a).[23] Taxpayer's primary business activity was developing and selling software and computer hardware, and as discussed above there is evidence in this case that the CFCs were part of that very business. By definition, the Dividends were paid out of the CFCs' "earnings and profits" from their business; therefore, the evidence in the record to date suggests that the requirements of the exception may be satisfied. To be sure, the examples in the legislative history indicate that the legislature intended this exception to prevent the exclusion of receipts where the taxpayer was in the primary business of selling short-term securities or passively holding intangibles that produce interest or dividends. However, the logic of *Tektronix* requires the court to inquire whether the exception is limited to that circumstance. By its plain terms, it is not.

The department argues that to consider the primary business activity of the CFCs for purposes of the exclusion under ORS 314.665(6)(a) would necessarily require the court to disregard the form of taxpayer's business structure as a group of separate, although wholly owned, corporations. The court disagrees. *Moline Properties* and related cases require the separate existence of a corporation to be respected if a two-part test is satisfied: first, the corporation must have been created for business purposes; second, the corporation must actually conduct business activity in corporate form.[24] *Moline Properties, Inc. v. Comm'r*, 319 US 436, 438-39, 63 S Ct 1132, 87 L Ed 1499 (1943) ("Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity

---

[23] At the time ORS 314.665(6)(a) was enacted, the plain and technical definitions of "derived" were "formed or developed out of something else : DERIVATIVE : reflected or secondary in character : not original or primary," *Webster's* at 608 (unabridged ed 1993), and "received from a specified source," *Black's* at 444 (6th ed 1990). As with the meaning of "arising from," discussed above, the court sees no need to discuss this term further.

[24] The court does not address whether the two-part test is disjunctive or conjunctive.

or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity." (Internal footnotes and citations omitted.)). The court sees no reason why a corporation could not maintain its separate existence under *Moline Properties* while complying with the demands of a sole or controlling shareholder to pay dividends and to run its operations efficiently as part of a unitary group. The question, in any event, is one of fact to be determined, if raised, at trial.

The court will deny the department's cross-motion as to whether the Dividends were derived from taxpayer's primary business activity.

## VI.   CONCLUSIONS

For the foregoing reasons, the court concludes that (1) ORS 317.267(3) does not require the unsubtracted amounts of either taxpayer's Subpart F Income or the Dividends to be included in the apportionment formula; (2) ORS 314.665 (6)(a) does not apply to the unsubtracted portion of taxpayer's Subpart F Income because there are no "gross receipts" that constitute or match to taxpayer's Subpart F Income; and (3) a genuine issue of material fact exists regarding whether the Dividends arose from taxpayer's "holding" of the CFC stock and if so, whether under ORS 314.665(6)(a) the Dividends were derived from taxpayer's primary business activity. Now, therefore,

IT IS ORDERED that Plaintiff's Motion for Partial Summary Judgment is denied; and

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Partial Summary Judgment is denied.